[No. A043354. First Dist. Div. Three. Mar. 5, 1990.]

BERNIE DAMELE, Plaintiff and Respondent, v.
MACK TRUCKS, INC., Defendant and Appellant.

## COUNSEL

Capps, Staples, Ward, Hastings & Dodson and J. Lucien Dodson III for Defendant and Appellant.

Walkup, Shelby, Bastian, Melodia, Kelly, Echeverria & Link, Kevin Domecus, De Goff & Sherman and Victoria J. De Goff for Plaintiff and Respondent.

## OPINION

**WHITE, P. J.**—Plaintiff and respondent Bernie Damele was severely injured when he was caught between a truck and its trailer while working at the Altamont Landfill. The accident was caused in part by faulty brakes which had been recently serviced by appellant Mack Trucks, Inc. (hereafter Mack). The jury assessed respondent's damages at $650,000. It found that appellant Mack was 49 percent at fault, respondent's employer (Oakland Scavenger Company) was 49 percent at fault, and that respondent himself was 2 percent at fault. Judgment was entered in accordance with this verdict.

On appeal, Mack contends the trial court erred by instructing the jury on the duty of one in imminent peril (BAJI No. 4.40). In addition, Mack contends that the damages are excessive as a matter of law, and that the damages could not exceed the amount respondent specified in his statement of damages (Code Civ. Proc., § 425.11).[1] We reject these arguments and affirm the judgment.

---

[1] Unless otherwise noted, subsequent statutory references are to the Code of Civil Procedure.

*Statement of Facts*

*The Accident*

At the time of the accident, Mr. Damele was employed by Oakland Scavenger as a supervisor at the Altamont Landfill in Alameda County.[2] Garbage collected by Oakland Scavenger route trucks is delivered to a central facility in San Leandro. There it is loaded into large truck and trailer combinations and driven to the Altamont Landfill where it is dumped.

The garbage is dumped from the delivery trucks and their trailers by heavy equipment known as "tippers." Each tipper has a stationary ramp which leads up to a movable platform. The driver of the truck and trailer combination first backs up to a mark painted on the platform and remains in the truck. The tipper operator then uncouples the trailer from the truck. When the trailer is disconnected, its brakes automatically engage and lock the trailer into position on the tipper. The driver then drives forward to another tipper where the truck itself is dumped. After the trailer is disconnected, the tipper operator opens the trailer's back door, walks to a control panel adjacent to the deck, and from that position raises the deck so that the trailer is lifted vertically, causing the garbage to be dumped.

On the day of the accident (Mar. 23, 1983), Mr. Damele was relieving one of the regular tipper operators who was on a break.[3] During this time, an Oakland Scavenger driver backed a truck and trailer unit onto the tipper operated by Mr. Damele. Mr. Damele unhooked the parts which connected the trailer to the truck without any problem. He then waved to the driver to drive the truck forward off the ramp. When Mr. Damele turned to open the trailer's rear door he heard a noise and saw that the trailer's wheels were moving very slightly. Mr. Damele was afraid that the trailer would roll into the area where other trucks were waiting to be dumped, or that it might roll off the side of the tipper. Since the driver had only driven about 10 or 15 feet down the ramp, Mr. Damele thought that the trailer's locked brakes would hold it sufficiently to permit him to reconnect the trailer to the truck. He picked up the tongue on the trailer which connected it to the truck and

---

[2] Although his title was "supervisor," Mr. Damele's supervising responsibilities were minimal. His primary responsibility was to check time cards and make sure that the men did not get too much overtime. He also kept track of equipment fuel consumption and maintenance needs.

[3] Mr. Damele did not operate a tipper as part of his usual duties. He would only do so in an emergency, or when no one else was available. During the 18 months that Mr. Damele worked at the Altamont Landfill before the accident, he had helped out with the tippers on approximately 30 occasions.

told the truck driver to back up. As he did so, the trailer suddenly picked up speed, and Mr. Damele was caught between the truck and the trailer. As we explain in greater detail below, Mr. Damele's left chest and shoulder were severely crushed in the accident.

Nineteen days before the accident, Oakland Scavenger had sent the truck and trailer involved in the incident to Mack Trucks to have its brakes repaired. A postaccident investigation established that certain brake parts in the trailer (the drums and S-cam bushings) were worn and should have been replaced. These worn parts caused the brakes to go out of adjustment and fail at the time of the accident. An Oakland Scavenger employee testified that when the company sent work to Mack it expected a complete inspection and that all worn components would be replaced. This was especially true for brake work.

*Mr. Damele's Injuries*

Because appellant contends that the damages ($650,000) are excessive as a matter of law, we describe Mr. Damele's injuries in detail:

Mr. Damele—who was 56 at the time of the accident—suffered a massive crush injury of his left chest and shoulder. He had extensive muscle damage and so much internal bleeding that he lost nearly one-half his blood volume. This alone made the injury life threatening.

Internal blood loss and muscle damage release toxins and other substances into the circulation which are filtered out by the kidneys. So many substances were released into Mr. Damele's system that his kidneys partially failed for a while. This kidney failure was a likely cause of high blood pressure which Mr. Damele developed after the accident.

In addition, Mr. Damele's left lung partially collapsed soon after the accident. It was very difficult for him to breath and a machine was used to force air into his lungs to prevent him from developing pneumonia.

The most serious permanent injury Mr. Damele suffered was to his left shoulder and arm. His scapula (shoulder blade) was crushed, a nerve to a major arm muscle was damaged, and other ligaments and muscles were sheared off.

Mr. Damele was initially treated at a hospital in Livermore and was transferred to a San Francisco hospital after four days. Six days after the accident, Dr. Norris, an orthopedic surgeon specializing in shoulders, performed major surgery on Mr. Damele. He wired the fractured fragments,

attempted to reconstruct the muscles and ligaments, and to pin the dislocated joints. He described the repair of Mr. Damele's scapula as being like "trying to stick a custard pie to the wall." It was impossible to reconstruct Mr. Damele's left side to its normal position and function.

About a week or two after Mr. Damele was released from the hospital he developed a fever and had trouble breathing. His physicians performed a diagnostic angiogram which involved inserting a tube into Mr. Damele's arteries through an incision in his groin. The angiogram, which was very painful, revealed a blood clot in Mr. Damele's lungs. The clot was caused by the initial injury. Mr. Damele was again hospitalized and was treated with anticoagulant medication administered intravenously. After he was released from the hospital, Mr. Damele continued to take oral anticoagulants for about six months. Although the blood clot eventually dissolved, it may have caused permanent damage to the lung.

In July of 1983, Mr. Damele underwent a second surgery to remove a screw which had been inserted to hold his shoulder joint together. This was followed by yet another surgery in December to remove a misgrown bone spike that protruded under the skin of Mr. Damele's back.

At the time of trial—more than five years after the accident—Mr. Damele was unable to lift his left arm above 110 degrees. He has lost much of the strength in his left arm and is unable to do many normal motions or has difficulty doing them. He is unable to engage in sports or yard work. Although the pain of the injury has subsided, Mr. Damele is still bothered by his shoulder. According to Dr. Norris, Mr. Damele has little chance for further improvement in his condition.

Mr. Damele's doctors found him to be a cooperative and highly motivated patient. Although his internist thought he would be unable to return to work, Mr. Damele persevered and was able to return to work only 10 months after the accident. However, his responsibilities are now limited primarily to office work.

The parties stipulated that Mr. Damele's reasonable medical expenses were $40,049.11 and that his wage loss was $42,118.37.

Based on this evidence, the jury found Mr. Damele's total compensatory damages to be $650,000. It assessed comparative fault as follows: Mack Trucks, 49 percent; Oakland Scavenger, 49 percent;[4] and Mr. Damele, 2

---

[4]There had been three prior incidents where trailers had rolled off ramps or tippers. As a result, Oakland Scavenger had decided to set up the deck of the tipper to be tilted slightly towards the rear. This had not been done at the time of the accident.

percent. After reducing the damages by Mr. Damele's share of fault and deducting his worker's compensation benefits, the trial court entered judgment for $576,176.37, plus costs.

*Discussion*

A. *The Trial Court Properly Instructed the Jury on the Duty of One in Imminent Peril.*

■■,■■ Over appellant's objection, the trial court gave the following instruction on the duty of one in imminent peril: "A person who, *without negligence on his part,* is suddenly and unexpectedly confronted with peril arising from either the actual presence of, or the appearance of, imminent danger to himself or to others, is not expected nor required to use the same judgment and prudence that is required of him in the exercise of ordinary care in calmer and more deliberate moments. His duty is to exercise only the care that an ordinarily prudent person would exercise in the same situation. If at that moment he does what appears to him to be the best thing to do, and if his choice and manner of action are the same as might have been followed by any ordinarily prudent person under the same conditions, he does all the law requires of him, although in the light of afterevents, it should appear that a different course would have been better and safer." (BAJI No. 4.40 (7th ed. 1986) italics added.)

As stated in the instruction, the doctrine of imminent peril does not apply to a person whose conduct causes or contributes to the imminent peril. (*Pittman* v. *Boiven* (1967) 249 Cal.App.2d 207, 218 [57 Cal.Rptr. 319].) Appellant argues that the instruction should not have been given here because Mr. Damele negligently caused or contributed to the imminent peril. In particular, appellant relies on the fact that Mr. Damele left his place of safety to step between the rolling trailer and the truck. Appellant argues it was Mr. Damele's negligence which put him in danger.

Appellant's analysis is incorrect. The doctrine of imminent peril applies not only when a person perceives danger to himself, but also when he perceives an imminent danger to others. (*Leo* v. *Dunham* (1953) 41 Cal.2d 712, 714 [264 P.2d 1].) It is this principle which applies here.

■■ When Mr. Damele stepped between the trailer and the truck, this was his response to the appearance of imminent peril to others, which was presented when the trailer began to roll. There is no evidence that Mr. Damele was involved in creating the brake failure or in positioning the tipper at an improper angle. It was the combination of these two events which caused the trailer to roll and created the imminent peril. Consequent-

ly, the dangerous situation existed before Mr. Damele left his place of safety.

Nor are we persuaded by appellant's argument that no imminent peril to others existed because the truck had not left the ramp and consequently blocked the trailer. There was evidence that trailers had rolled off the *side* of the tipper in the past. More importantly, the mere appearance of an imminent peril to others—not an actual imminent peril—is all that is required to invoke the doctrine.

▉ Whether the conditions for application of the imminent peril doctrine exist is itself a question of fact to be submitted to the jury. (*Leo* v. *Dunham, supra*, 41 Cal.2d at pp. 714-716; *Reynolds* v. *Filomeo* (1951) 38 Cal.2d 5, 14-15 [236 P.2d 801]; *Warren* v. *Sullivan* (1961) 188 Cal.App.2d 150, 154 [10 Cal.Rptr. 340].) ▉ Here, there was evidence which would permit a reasonable jury to conclude that those conditions existed. Consequently, the trial court acted properly when it gave the instruction.

Moreover, even if we agreed with appellant that Mr. Damele's conduct caused or contributed to creating the perilous situation as a matter of law, reading the instruction would have been harmless error. The instruction permitted the jury to apply the imminent peril doctrine, but did not require that it do so. The instruction indicates on its face that the doctrine applies only to those who did not cause or contribute to the imminent peril. If the question were as clear as appellant claims it is, then it follows that the jury would have found the doctrine inapplicable. In these circumstances, it is not reasonably probable that the jury would have reached a different verdict had the trial court not given the instruction. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 353, pp. 356-357.)

B. *The Damage Award Is Amply Supported by the Evidence.*

▉ Appellant next contends that Mr. Damele's injuries cannot support $650,000 in compensatory damages. As we think even a cursory reading of the statement of fact establishes, this claim is patently meritless.[5]

Appellant's contention is based on the ratio of the special damages to general damages (approximately $82,000 to $568,000), the fact that appellant returned to work within a year of the injury and the alleged absence "of

[5] Indeed, had this been the only issue raised in this appeal we would have contemplated imposing sanctions for filing a frivolous appeal. (§ 907; Cal. Rules of Court, rule 26(a); *In re Marriage of Flaherty* (1982) 31 Cal.3d 637 [183 Cal.Rptr. 508, 646 P.2d 179].)

any severe emotional distress or psychological problems as a result of the injury."

■ A jury may award a plaintiff reasonable compensation for physical pain, discomfort, fear, anxiety and other emotional distress which he has suffered and which he will suffer in the future as the result of an injury. The law does not prescribe a definite standard or method to calculate compensation for pain and suffering. The jury is merely required to award an amount that is reasonable in light of the evidence. (BAJI No. 14.13 (7th ed. 1986).) An appellate court may not disturb an award of such general damages unless the amount "is so disproportionate to the injuries suffered that the result reached may be said to shock the conscience . . . ." (*Daggett* v. *Atchison, T & S. F. Ry. Co.* (1957) 48 Cal.2d 655, 666 [313 P.2d 557, 64 A.L.R.2d 1283]; *DiRosario* v. *Havens* (1987) 196 Cal.App.3d 1224, 1241 [242 Cal.Rptr. 423].)

■ Given the extent of Mr. Damele's injuries, his four hospitalizations, three operations, loss of function, and future pain, an award of $568,000 for pain and suffering does not shock our conscience. Indeed, the only thing we find shocking is appellant's suggestion that respondent has not suffered any severe emotional distress as a result of being crushed between two 40,000-pound vehicles. Nor do we think Mr. Damele should be penalized—as appellant seems to suggest—for his exemplary motivation and desire to return to work.

In light of the evidence, the amount of general damages awarded is clearly reasonable.

C. *General Damages Awarded After Trial Are Not Limited to the Amount of Damages Prayed For in a Statement of Damages Filed Pursuant to Section 425.11.*

■ Finally, appellant contends that the amount of general damages should have been limited to the amount respondent specified in his statement of damages filed pursuant to section 425.11. This statement indicates that respondent's general damages were $400,000. As indicated, after trial the jury awarded Mr. Damele nearly $568,000 in general damages.

We conclude that a section 425.11 statement of damages replaces the specification of damages which is generally required to be made in the complaint. Under general rules of pleading and practice, the plaintiff is not limited to the damages specified in his complaint when he proceeds to trial. Consequently, he is also not limited by the amount requested in a section 425.11 statement of damages.

The general rule is established by section 580, which states: "The relief granted to the plaintiff, *if there be no answer,* cannot exceed that which shall have demanded in his complaint; but in any other case, the Court may grant him any relief consistent with the case made by the complaint and embraced within the issue." (Italics added.)

This statute precludes the plaintiff from obtaining a default judgment against a defendant which exceeds the specific amount demanded in the complaint. This is because fundamental fairness entitles a defendant to notice of the maximum amount of damages for which he may be liable before he is subjected to a default judgment. (*Greenup* v. *Rodman* (1986) 42 Cal.3d 822, 826 [231 Cal.Rptr. 220, 726 P.2d 1295]; *Becker* v. *S. P. V. Construction Co.* (1980) 27 Cal.3d 489, 493-494 [165 Cal.Rptr. 825, 612 P.2d 915].)

In a contested, case, however, the "well settled" rule is that a plaintiff may secure relief different from or greater than that demanded in the complaint. (4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 449, p. 492; *Greenup* v. *Rodman, supra,* 42 Cal.3d at pp. 826-827.) However, even after trial, a court generally may not award a plaintiff a sum in excess of the amount of damages he claims to have sustained unless he amends his complaint to conform to proof. (*Castaic Clay Manufacturing Co.* v. *Dedes* (1987) 195 Cal.App.3d 444, 449 [240 Cal.Rptr. 652].)

This later rule was cited, though not followed, in *Castaic Clay, supra,* 195 Cal.App.3d 444. There, the court affirmed an award of $500,000 in compensatory damages after a trial on the merits in a slander of title case, even though the complaint sought general damages of only $50,000, and no amendment was made to conform to proof. The court reasoned that this award was permitted by section 580 which provides that if an answer is filed "the Court may grant [the plaintiff] any relief consistent with the case made by the complaint and embraced within the issue." The *Castaic* court noted that "the trial court admitted evidence of general compensatory damages of at least the $500,000 general damages sum awarded . . . . The parties thus actually tried the issues of damages in amounts above the limits set forth in the body of the complaint. The amount of the trial court's judgment on those issues therefore could not have come as any surprise to defendant and was the source of no prejudice to him since no additional time or effort by him was required to meet those issues. (195 Cal.App.3d at pp. 449-450.) The court concluded: "It is lamentable that plaintiff counsel did not move to amend the pleadings to conform to proof but judicial economy would be ill served by requiring this case to be retried because of that technicality. We

therefore conclude that the award of compensatory damages shall be affirmed." (*Id.*, at p. 450.)[6]

Appellant does not challenge the general rule that, after trial, a plaintiff may be awarded more than he requested in his complaint; nor does he challenge the *Castaic* court's refusal to reverse for a failure to amend the complaint to conform to proof. Instead, he contends that these rules should not apply where, as here, the damages are specified in a statement of damages filed pursuant to section 425.11, rather than in the complaint itself. We disagree.

In 1974, section 425.10, subdivision (b) was amended, and section 425.11 was enacted. (Stats. 1974, ch. 1481, § 1.) As amended, section 425.10, subdivision (b) provides that a complaint for personal injury shall *not* state the amount of damages sought by the plaintiff. The purpose of this omission is to protect defendants from adverse publicity resulting from inflated demands, particularly in medical malpractice cases. (*Jones* v. *Interstate Recovery Service* (1984) 160 Cal.App.3d 925, 928 [206 Cal.Rptr. 924]; *Plotitsa* v. *Superior Court* (1983) 140 Cal.App.3d 755, 759 [189 Cal.Rptr. 769].)

In order to provide a personal injury defendant with notice of the plaintiff's claimed damages, section 425.11 states that such a defendant "may at any time request a statement setting forth the nature and amount of damages being sought." The plaintiff has 15 days to respond to the request. "If no request is made for such a statement setting forth the nature and amount of damages being sought, the plaintiff shall give notice to the defendant of the amount of special and general damages sought to be recovered (1) before a default may be taken; or (2) in the event an answer is filed, at least 60 days prior to date set for trial." (§ 425.11.)[7]

---

[6] Appellant's petition for review in *Castaic Clay* was denied by the Supreme Court on December 22, 1987. (195 Cal.App.3d at p. 451.)

[7] Sections 425.10 and 425.11 provide in full: "§ 425.10. A complaint or cross-complaint shall contain both of the following: [¶] (a) A statement of the facts constituting the cause of action, in ordinary and concise language. [¶] (b) A demand for judgment for the relief to which the pleader claims he is entitled. If the recovery of money or damages be demanded, the amount thereof shall be stated, unless the action is brought in the superior court to recover actual or punitive damages for personal injury or wrongful death, in which case the amount thereof shall not be stated."

"§ 425.11. When a complaint or cross-complaint is filed in an action in the superior court to recover damages for personal injury or wrongful death, the party against whom the action is brought may at any time request a statement setting forth the nature and amount of damages being sought. The request shall be served upon the plaintiff or cross-complainant, who shall serve a responsive statement as to the damages within 15 days thereafter. In the event that a response is not served, the party, on notice to the plaintiff or cross-complainant, may petition the court in which the action is pending to order the plaintiff or cross-complainant to

■ Section 425.11 was designed to give a defendant one "last clear chance" to respond to the allegations of the complaint and to allow him to avoid a default judgment for a substantial sum without any actual notice of his potential liability. (*Stevenson* v. *Turner* (1979) 94 Cal.App.3d 315, 319-320 [156 Cal.Rptr. 499]; *Jones* v. *Interstate, supra,* 160 Cal.App.3d at pp. 928-929; *Hamm* v. *Elkin* (1987) 196 Cal.App.3d 1343, 1346 [242 Cal.Rptr. 545].) This notice is essential because "knowledge of the alleged amount of damages may be crucial to a defendant's decision whether to permit a . . . default." (*Hamm, supra,* 196 Cal.App.3d at p. 1346.)

In short, the purpose of a section 425.11 statement of damages is essentially identical to that of the statement of damages required in all non-personal injury[8] complaints (§ 425.10, subd. (b)); that is, to insure "fundamental fairness" by giving a defendant notice of the maximum amount of damages for which he may be liable before he is subjected to a default judgment. (*Greenup* v. *Rodman, supra,* 42 Cal.3d at p. 826; *Becker* v. *S. P. V. Construction Co., supra,* 27 Cal.3d at pp. 493-494.)

■ Given this essential identity of purpose, we see no reason why the general rules respecting a section 425.11 statement of damages should be any different from those governing a statement of damages made in the complaint pursuant to section 425.10. That is, although a plaintiff is limited by his section 425.11 statement of damages when a default is taken (*Petty* v. *Manpower, Inc.* (1979) 94 Cal.App.3d 794, 798 [156 Cal.Rptr. 622]), he is not so limited when an answer is filed and the case proceeds to trial (4 Witkin, Cal. Procedure, *supra,* Pleading, § 449, p. 492; *Greenup* v. *Rodman, supra,* 42 Cal.3d. at pp. 826-827).

The sole authority appellant cites in support of its position is *Plotitsa* v. *Superior Court, supra,* 140 Cal.App.3d 755. In that case the court stated in dictum that a plaintiff must strictly follow the requirements of section 425.11 and specify the amount of both special and general damages before a default may be entered. The court observed: "Although sections 425.10 and 425.11 are silent as to the purpose of requiring a statement of both special and general damages sought, it certainly appears that such information aids a defendant in evaluating the validity of plaintiff's damage claims with regard to their provability." (*Id.,* at pp. 761-762.) This does not mean—as appellant suggests—that the statement required by section 425.11 is primarily intended to give a defendant specific notice of such damages prior to

---

serve a responsive statement. [¶] If no request is made for such a statement setting forth the nature and amount of damages being sought, the plaintiff shall give notice to the defendant of the amount of special and general damages sought to be recovered (1) before a default may be taken; or (2) in the event an answer is filed, at least 60 days prior to date set for the trial."

[8] By its terms, section 425.11 is also applicable to wrongful death claims.

trial.[9] The amount—*and* provability—of damages may be important to a defendant's decision to take a default. Nothing in *Plotitsa* suggests that our analysis is incorrect.

█ Finally, appellant claims that unless an amendment or a new statement of damages is required, the provision in section 425.11 which appellant claims requires that notice be given 60 days before trial will become meaningless. Appellant has read the statute incorrectly. It only requires the plaintiff to file a statement of damages "at least" 60 days before the date set for trial. Therefore, the plaintiff could file it on the day that the defendant answers. This is the only notice to which a defendant is entitled before a contested trial. The requirement of a statement of damages in a nondefault situation is simply to insure that the damage portion of the prayer, which had to be omitted under section 425.10, subdivision (b), is supplied at some point before trial. In this respect, it has no more significance than the requirement in section 425.10, subdivision (b), that a nonpersonal injury complaint contain a statement of the money damages sought.

In sum, Mr. Damele's recovery at trial was not limited by the amount requested in his section 425.11 statement of damages. Although "[i]t is lamentable" that Mr. Damele's counsel did not move to amend the section 425.11 statement to conform to proof, "judicial economy would be ill served by requiring this case to be retried because of that technicality. We therefore conclude that the award of compensatory damages shall be affirmed." (*Castaic Clay, supra*, 195 Cal.App.3d at p. 450.)

The judgment is affirmed.

Merrill, J., and Strankman, J., concurred.

---

[9] Indeed, on its face the statute indicates that the plaintiff need separately specify the amount of general and special damages only when no specific request for a statement of damages is made. When one is requested by the defendant, the statute does not specify the required content of the statement of damages; the plaintiff is merely required to "serve a responsive statement as to the damages within 15 days . . . ." (§ 425.11) Thus, if a request does not ask for a separate specification of special and general damages, a "responsive statement" would not have to draw that distinction.