**Herbert DESROSIERS; Gene Desrosiers, Guardian Ad Litem for Herbert Desrosiers, Plaintiffs–Appellees,**

v.

**FLIGHT INTERNATIONAL OF FLORIDA INC., Defendant–Appellant.**

No. 97–16062.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 12, 1998.

Decided Sept. 15, 1998.

Mark A. Dombroff, Dombroff & Gilmore, Washington, D.C., for defendant-appellant.

Patrick G. Vastano, Vastano & Angarella, Los Angeles, California, for plaintiffs-appellees.

Before: LAY,[*] KOZINSKI and T.G. NELSON, Circuit Judges.

LAY, Circuit Judge:

Flight International ("Flight") appeals the judgment of the district court in favor of Herbert Desrosiers and Joshua Rodriguez in a diversity action arising out of a plane crash at Edwards Air Force Base, California. The jury assessed Flight's comparative fault·for the crash to be forty-two percent. Flight filed a motion for new trial asserting several errors occurred during the trial. The district court denied the motion for new trial and entered judgment on the verdict. This appeal follows.

## I.  Factual and Procedural Background

Flight International[1] had a three-year, $2.5 million contract with the U.S. government to provide and maintain three aircraft at the U.S. Naval Air Weapons Station in China Lake, California. Under the terms of the contract, Flight was required to provide on-site maintenance and to ensure that personnel assigned to perform maintenance tasks on the aircraft and related components were licensed and qualified.

Equipment required to be maintained under the contract included a dual-display navigational instrument known as the Distance Measuring Equipment ("DME"). The DME is an instrument used to inform the pilot of the distance between the aircraft and a transmitter at the airport. Information from the DME is displayed on both the pilot's side and on the co-pilot's side of the cockpit.

On May 18, 1992, Navy Lieutenant David Garnett piloted a Mitsubishi MU-2 aircraft, owned and maintained by Flight, from China Lake to Edwards AFB. The flight covered forty-five miles and normally took less than twenty minutes. The MU-2 is a ten-seat, twin-engine turboprop airplane. The plane was carrying nine people, including the pilot. Weather conditions for the flight were excellent; there were no visibility problems.

During the trial, Flight admitted the DME system in the MU-2 was not reliable. Evidence was produced to show that the DME was not working ·on certain frequencies and gave incorrect readings, thus giving a pilot inaccurate distance information. Flight also admitted that the DME was not maintained in a proper working condition on the day of the accident. Normally, if equipment was not working, an "inoperative" placard would be affixed to the instrument panel. The Federal Aviation Administration provides a Minimum Equipment List which requires an inoperative sticker to be placed on the equipment in order to inform the crew of the equipment condition. No placard was placed on the DME. Instead, a "can" placard was placed in a maintenance log, stating: "Number 1 DME inop. on various frequencies." ER at 111. However, Flight's maintenance engineer based at China Lake testified that the placard did not mean the DME could not be used.

There also was substantial evidence from which the jury could infer the pilot was using the No. 1 DME as he flew toward Edwards AFB. The DME switch positions at impact were set to receive information on the No. 1 DME through the NAV1 radio. The switch positions indicate Lt. Garnett flew directly toward the Edwards TACAN (TACtical Aero Navigation) radio transmitter, and was using the instrument for direction instead of navigating by sight.

The flight was uneventful until shortly before the plane reached Edwards AFB. At that time, Lt. Garnett radioed the Edwards control tower and reported his plane was fifteen miles northeast of the landing field. In reality, the plane was only about eight

---

[*] Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, sitting by designation.

1. Appellants in this case are Flight International of Florida, Inc., Florida International, Inc., and

Flight International Group, Inc., referred to here collectively as ("Flight").

miles from the field. Shortly after reporting he was fifteen miles out, Lt. Garnett flew over the Edwards TACAN radio transmitter and realized he had misreported his position to the control tower. The MU–2 was flying directly toward Edwards' main runway and into the flight path of military aircraft.

In an effort to correct his position, Lt. Garnett made a 360–degree turn into the high-speed, tower fly-by line.[2] The turn placed the MU–2 directly in front of a descending F–16 fighter aircraft, which flew over the top of the slower-moving airplane. A "wake turbulence" from the F–16 hit the MU–2 a few seconds later, causing Lt. Garnett to lose control of the airplane and crash into the desert. Lt. Garnett was killed in the crash.

Desrosiers, a Navy enlisted man, suffered brain injury in the accident; Airman Lorenzo Rodriguez was killed. Desrosiers and Joshua Rodriguez, the son of Airman Rodriguez, filed actions through their respective guardians ad litem against several parties, including Flight. A consolidated trial on liability was held in November 1996 in district court, in which the jury assessed Lt. Garnett's contributory fault for the crash to be fifty-eight percent, and Flight's contributory fault to be forty-two percent.

A trial on damages was held a month later, resulting in a $20 million award for Desrosiers, and a $1.4 million judgment in favor of Rodriguez.[3] The district court in May 1997 denied the defendant's motion for new trial on liability, and in June 1997 denied its motion for a new trial on damages.

*II.  Proximate Cause*

■ Under California law, the proximate cause of an injury is a cause which is a substantial factor in bringing about the injury. *See Mitchell v. Gonzales,* 54 Cal.3d 1041, 1 Cal.Rptr.2d 913, 819 P.2d 872, 878–79 (1991) (in bank) (endorsing a "substantial factor" test for proximate cause). "Generally causation is a question of fact for the jury. However, it may be determined as a matter of law when reasonable persons could not dispute the absence of causation." *Bockrath v. Aldrich Chem. Co.,* 74 Cal.Rptr.2d 774, 784, 64 Cal.App.4th 1 (1998).

Flight argues that, as a matter of law, an inaccurate DME reading "cannot be the proximate cause of the accident because the risk of harm from an inoperative DME was not the risk that caused the accident." Flight Br. at 48. Instead, Flight argues, "[t]he risk of harm from a DME that gave a misleading distance report would be that it would lead to confusion among other pilots and the tower as to his position resulting in his aircraft being mis-sequenced for landing." *Id.*

Because the risk of foreseeable harm—the mis-sequencing of aircraft—did not actually occur, Flight concludes, "the alleged error from [the DME] could not be a proximate cause of the accident." *Id.* at 49. The defendant now asks this court to reverse the jury's determination, and enter a judgment as a matter of law in their favor.

The defendant's request for a judgment as a matter of law from this court, however, is procedurally problematic. Under Federal Rule of Civil Procedure 50(a), a defendant may request the trial court to grant a judgment as a matter of law at the close of plaintiff's evidence, or at the close of all of the evidence, if "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party. . . ." After a jury verdict, the moving party may *renew* its request for a judgment as a matter of law under Rule 50(b).

■ According to the trial record submitted to this court, Flight did not at any time move for a judgment as a matter of law at the close of the plaintiff's case, or at the close of all the evidence. In order to preserve the right to move for a judgment notwithstanding the verdict under Rule 50(b), a motion under Rule 50(a) first must be made. *See, e.g., Pierce v. Southern Pac. Transp. Co.,* 823

---

**2.**  The tower fly-by line runs parallel to the Edwards AFB main base Runway 22, and is used by aircraft to practice various maneuvers without actually landing.

**3.**  Following the plaintiffs' acceptance of a remittitur in May 1997, the district court reduced the judgment to $8.6 million for Desrosiers, and $821,250 for Rodriguez.

F.2d 1366, 1369 (9th Cir.1987); *Farley Transp. Co. v. Santa Fe Transp. Co.*, 786 F.2d 1342, 1345–46 (9th Cir.1985).

■ However, more importantly, in the absence of a Rule 50(b) motion, it is clear this court does not have the *power* to grant such a judgment. *See Johnson v. New York, New Haven & Hartford R.R. Co.*, 344 U.S. 48, 50, 73 S.Ct. 125, 97 L.Ed. 77 (1952); *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 217–18, 67 S.Ct. 752, 91 L.Ed. 849 (1947). As the Supreme Court stated in *Cone:*

> The respondent failed to submit a motion for judgment notwithstanding the verdict to the trial judge in order that he might exercise his discretionary power to determine whether there should be such a judgment, a dismissal or a new trial. In the absence of such a motion, we think the appellate court was *without power* to direct the District Court to enter judgment contrary to the one it had permitted to stand.

330 U.S. at 217–18, 67 S.Ct. 752. (our emphasis).

The only motion filed by Flight following the verdict was a motion for a new trial under Rule 59, on the ground that the verdict for liability was against the greater weight of the evidence. This motion was denied by the district court, which found that "[n]o miscarriage of justice will occur if the jury's liability verdict stands." *Desrosiers v. Mitsubishi Aircraft Int'l, Inc.*, Nos. 93–5707, 95–5598, (E.D. Calif. May 16, 1997) (Memorandum Opinion and Order Re: Defendants' Motions for New Trial), at 8; ER at 158.

■ Because Flight failed to make a Rule 50(b) motion, this court has no power to grant, and therefore cannot consider, a judgment as a matter of law. *See Johnson*, 344 U.S. at 50, 73 S.Ct. 125; *Cone*, 330 U.S. at 217–18, 67 S.Ct. 752. For this reason, the only issue properly before us regarding causation is the district court's denial of a motion for a new trial under Rule 59. While we would review de novo a district court's denial of a motion for judgment as a matter of law, *see, e.g., McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 354 (9th Cir.1996), this court will

not overturn a district court's denial of a motion for a new trial absent a clear abuse of discretion. *See, e.g., Scott v. Ross*, 140 F.3d 1275, 1281 (9th Cir.1998); *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir.1997).

■ Courts of Appeals accord great deference to Rule 59 rulings from the district court. As Justice White, while sitting by designation on the Eighth Circuit, aptly put it:

> [W]here the basis of a Rule 59 ruling is that the verdict is not against the weight of the evidence, and where the district court balances and weighs the evidence based on the proper legal standards, the court's denial of a Rule 59 motion is virtually unassailable. In such cases, we reverse for a clear abuse of discretion only where there is an *absolute absence of evidence* to support the jury's verdict.

*Pulla v. Amoco Oil Co.*, 72 F.3d 648, 656–57 (8th Cir.1995) (internal citations omitted) (emphasis added). In light of this high standard and the parties' posture at trial, we hold the district court did not abuse its discretion by denying the Rule 59 motion in regard to a finding of proximate cause.

The district court amply set forth the evidence in support of the jury's finding on causation in its order denying a motion for a new trial. *See* ER at 156–58. The court pointed out that "[c]onflicting inferences can be drawn from the evidence presented," but stated "[t]he court is not firmly convinced that the jury made a mistake in implicitly finding Lt. Garnett relied in some degree upon the DME." ER at 157. It concluded "[t]here was sufficient evidence to show that Lt. Garnett was placed in an emergency situation because of the inaccurate distance report, which the jury found to be caused by the malfunctioning DME . . . ." *Id.* In other words, despite conflicting inferences, there was enough evidence presented to make the issue of causation a question for the jury.

Flight argues that, while proximate cause *ordinarily* is a question of fact for the jury, the issue is a question of law in this case if "the facts are undisputed, and only one conclusion may be drawn therefrom . . . ." Flight Br. at 47 (citing *Kane v. Hartford*

*Accident & Indem. Co.*, 98 Cal.App.3d 350, 159 Cal.Rptr. 446 (Cal.Ct.App.1979)). But Flight's argument is nothing more than an attempt to squirm away from the jury's proximate cause finding by asking this court to draw a different conclusion from the facts than the jury did.

Flight reasons that even if Lt. Garnett did rely upon a malfunction of the DME, the only foreseeable "risk of harm" that could result from such reliance would be mis-sequencing of planes. The jury, however, reached a different conclusion from the evidence; it found the "risk of harm" encompassed the danger that the pilot would become disoriented. The fact the jury reached a different conclusion than that advocated by the defense does not make the finding legally insufficient.[4]

Applying California law, the district court only needed to determine that there was sufficient evidence to support the jury's finding that Flight's actions were a "substantial factor" in the crash of the MU–2. *See Mitchell*, 1 Cal.Rptr.2d 913, 819 P.2d at 878–79. Flight fails to show that the district court abused its discretion in making such a finding. Because there is not "an absolute absence of evidence" on the issue of proximate cause, the district court's denial of a new trial "is virtually unassailable." *Pulla*, 72 F.3d at 656–57. We find no abuse of discretion.

*III. The "Imminent Peril" Jury Instruction*

■ Under California law, the "imminent peril doctrine" applies when "a person who, without negligence on his part, is suddenly and unexpectedly confronted with peril, aris-

ing from either the actual presence, or the appearance, of imminent danger to himself or to others." *Leo v. Dunham*, 41 Cal.2d 712, 264 P.2d 1, 2 (1953) (in bank). Under these circumstances, a person "is not expected nor required to use the same judgment and prudence that is required of him in exercise of ordinary care in calmer and more deliberate moments." *Id.*

■ The doctrine of imminent peril does *not* apply to a person whose conduct causes or contributes to the imminent peril. *See Damele v. Mack Trucks, Inc.*, 219 Cal. App.3d 29, 267 Cal.Rptr. 197, 201 (1990); *Pittman v. Boiven*, 249 Cal.App.2d 207, 57 Cal.Rptr. 319, 325 (1967). However, whether the conditions for application of the imminent peril doctrine exist is itself a question of fact to be submitted to the jury. *See Damele*, 267 Cal.Rptr. at 201; *Leo*, 264 P.2d at 3; *Reynolds v. Filomeo*, 38 Cal.2d 5, 236 P.2d 801, 806–07 (1951) (in bank).

■ Flight argues it was improper for the district court to give the jury an instruction on imminent peril in this case, because "[t]o the extent that Lieutenant Garnett found himself confronted with a sudden emergency, that emergency was one of his own creation." Flight Br. at 14.[5] It argues that there was no "sudden emergency" until the MU–2 encountered the turbulence from the F–16, and that Lt. Garnett "committed numerous acts of negligence" prior to the crash "that directly resulted in this emergency." *Id.* at 16.

■ Jury instructions must fairly and adequately cover the issues presented, correctly state the law, and must not be mis-

---

4. Flight also argues that any alleged inaccurate information from the DME could not have been the proximate cause of the accident because, once Lt. Garnett completed his 360–degree turn in an attempt to correct his position, "the aircraft was exactly where controllers and other aircraft assumed it to be." Flight Br. at 46. A review of the record indicates this is a misleading assertion. The MU–2 was *not* "exactly" in the same position it would have been had the DME been functioning correctly. A reasonable inference is that the original miscalculation caused by the DME was not corrected by the turn and, in fact, the difference placed the MU–2 directly into the flight path of the Navy jets.

Flight's argument also infers that the control tower must have known that the MU–2 and the F–16 were dangerously close, yet did nothing to correct the situation. However, Flight's own expert, accident reconstructionist Ronald Smith, testified that he found nothing wrong with the actions of the tower. *See* SER at 151.

5. The plaintiffs contend that under Federal Rule of Civil Procedure 51, Flight has waived an appeal of the jury instructions by failing to properly object at trial. The record does not demonstrate any specific objection along the lines Flight now raises. Nonetheless, for purposes of this appeal, we will assume Flight properly preserved this objection.

leading. *See, e.g., Abromson v. American Pac. Corp.,* 114 F.3d 898, 902 (9th Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 1040, 140 L.Ed.2d 105 (1998). Whether the required factual foundation exists to support a requested jury instruction is reviewed for an abuse of discretion. *See, e.g., United States v. Hairston,* 64 F.3d 491, 493 (9th Cir.1995).

Upon review of the record, we find that the district court's jury instructions regarding imminent peril correctly stated the doctrine under California law, were not misleading, and fairly and adequately covered the issue as it related to Lt. Garnett's actions.[6] Flight's objections regarding the propriety of the instructions again boil down to a call to reweigh evidence presented to the jury and reassess its conclusions. Second-guessing the jury's findings on this issue, however, is not a permissible role for this court.

We note again that whether the conditions exist for application of the imminent peril doctrine is itself a question of fact the jury must decide. *See Damele,* 267 Cal.Rptr. at 201; *Leo,* 264 P.2d at 3; *Reynolds,* 236 P.2d at 806–07. In other words, the jury in this case was *required* to examine the fact-based questions the defendant now disputes on appeal in order to determine how and if the doctrine should be applied. Those questions included whether an imminent peril in fact developed, whether that peril arose because of Lt. Garnett's own negligence, and at what point that emergency ended. After answering those questions, the jury concluded that while the actions of Lt. Garnett were the major cause of the mishap (assessed at fifty-eight percent liability), the malfunctioning of the DME also contributed to the crash.

The district court could not have abused its discretion unless there was no factual foundation to support such an instruction. *See Hairston,* 64 F.3d at 493. The record in fact indicates ample evidence supporting an imminent peril instruction, including: 1) Lt. Garnett was unfamiliar with the airbase; 2) the pilot was flying a slow aircraft into the path of nine to twelve Navy jets; 3) Lt. Garnett's radio calls to the tower to correct his position went unanswered; and 4) the approaching Navy jets could not hear Lt. Garnett's transmissions.

The defendant does not contend that the jury instruction was unintelligible or an incorrect statement of California law. Instead, Flight essentially argues that the doctrine itself was improperly applied. But because whether conditions exist for application of the doctrine is itself a jury question, the district court was *obligated* to give the requested imminent peril instruction as long as a factual predicate existed. Given the ample evidence supporting the possibility of imminent peril, as well as the fact-based nature of the doctrine's application, we cannot conclude that the district court abused its discretion by giving this instruction.[7]

## IV. The Plaintiff's Expert Witnesses

Flight argues that the opinions of plaintiffs' expert witness on accident reconstruction, Melvin Underwood, should not have been admitted into evidence, because Underwood "failed to use proper scientific methods in arriving at his conclusions." Flight Br. at 27. The defendant contends Underwood's opinions "did not comply with what Mr. Un-

---

**6.** The court's instructions regarding imminent peril were as follows:

A person who, without negligence upon his part, is suddenly and unexpectedly confronted with peril arising from the actual presence of or the appearance of imminent danger to himself or others, is not expected nor required to use the same judgment and prudence that is required in the exercise of ordinary care in calmer and more deliberate moments. His duty is to exercise the care that an ordinarily prudent person would exercise in the same situation.

If at the moment he does what appears to him to be the best thing to do, and if his choice

and manner of action are the same as might have been followed by any ordinarily prudent person under the same conditions, he does all that the law requires of him. This is true even though in light of after events it should appear that a different course would have been better and safer.

SER at 148–49.

**7.** In addition, in light of the jury's assessment that the pilot's negligence contributing to the cause of the crash was 58%, it is difficult to find any prejudice to the defendant. The instructions expressly told the jury that the imminent peril doctrine applies only to a person who is not otherwise negligent.

derwood testified would be the methodology of an instrument analyst specialist," *id.* at 28, and did not otherwise comply with the requirements for reliable scientific testimony set out in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Additionally, Flight argues that the district court erred by allowing the testimony of air-crash analyst Norman Horton, because Horton "relied upon Mr. Underwood's unsupported and improper opinions regarding the reading of the pilot side DME display...." *Id.* at 38.[8]

Under *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, a trial judge is charged with a "gatekeeping" role to ensure that all scientific testimony or evidence admitted is both reliable and relevant. In order to determine whether scientific reasoning is valid under *Daubert*, a trial court is to consider factors such as whether the reasoning: 1) can be and has been tested; 2) has been subject to peer review; 3) has a known or potential rate of error; and 4) generally has been accepted by the scientific community. 509 U.S. at 593–94, 113 S.Ct. 2786. However, the *Daubert* standards for admissibility may not apply to expert testimony based on technical, rather than scientific, knowledge. *See McKendall v. Crown Control Corp.*, 122 F.3d 803, 806 & n. 1 (9th Cir.1997); *United States v. Webb*, 115 F.3d 711, 716 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 429, 139 L.Ed.2d 329 (1997).

■ The Supreme Court recently reiterated that abuse of discretion is the proper standard by which to review a district court's decision to admit or exclude expert testimony. *See General Elec. Co. v. Joiner*, —— U.S. ——, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997). The Court stated: "[I]t is very much a matter of discretion with the court whether to receive or exclude the evidence; but the appellate court will not reverse in such a case, unless the ruling is manifestly erroneous." *Id.* (quoting *Spring Co. v. Edgar*, 99 U.S. 645, 658, 25 L.Ed. 487 (1878)).

We find Flight's objections to the admission of the plaintiffs' expert opinions to be without merit for several reasons. First, recent decisions in this circuit have called into question whether *Daubert* should apply to *technical*, as opposed to *scientific* expertise. In *Webb*, 115 F.3d at 716, this court held that the *Daubert* standards of admission did not apply to expert testimony regarding law enforcement, because the testimony did not involve *scientific* knowledge. More recently, in *McKendall*, 122 F.3d at 806, this court noted that "[t]he Ninth Circuit has recognized that *Daubert* is confined to the evaluation of 'scientific' expert testimony."[9]

■ In light of these rulings, we believe the admission of Underwood's and Horton's testimony properly should be assessed under the Federal Rule of Evidence 702 and its broad parameters of reliability, relevancy, and assistance to the trier of fact.[10] However, even under the *Daubert* standards for scientific evidence, we cannot find that the district court abused its discretion by allowing Underwood and Horton to testify as ex-

---

8. Plaintiffs argue Flight has waived appeal of the admission of Underwood's testimony because "Flight only vaguely challenged Underwood's qualifications" at trial. Plaintiffs Br. at 33. As with the challenge to the jury instructions, we once again will assume for purposes of appeal that Flight properly preserved this issue.

9. Admittedly, there is some confusion on this question. Defendant points to footnotes in two other Ninth Circuit cases, *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n. 8 (9th Cir.1997), and *Claar v. Burlington Northern R.R. Co.*, 29 F.3d 499, 501 n. 2 (9th Cir.1994), that indicate *Daubert* should apply to technical as well as scientific evidence. We believe the language in those cases is dicta and results from a misreading of footnote 11 in *Daubert*, 509 U.S. at

592, 113 S.Ct. 2786, which dealt with *Daubert*'s application to novel, as well as established, scientific techniques. *Cf. Daubert*, 509 U.S. at 590 n. 8, 113 S.Ct. 2786 ("Our discussion is limited to the scientific context because that is the nature of the expertise offered here.") At the very least, *Daubert*'s application to non-scientific evidence is debatable.

10. Federal Rule of Evidence 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

pert witnesses.[11]

■ The record shows that Underwood has extensive experience with instrumentation analysis and electronic equipment such as the DME. His methodology included extensive review of maintenance records, wreckage, depositions, service manuals, textbooks, and the radar tape. *See id.* at 594–95, 113 S.Ct. 2786. Given the nature of this case—in which direct, physical evidence could yield few clues as to the cause of the crash—the circumstantial evidence Underwood employed was the best information available to reconstruct the accident.

■ While Flight proposes a *Daubert* strict "checklist" to determine the suitability of Underwood's and Horton's testimony, the *Daubert* court was quite clear that no such checklist was ever intended. *See* 509 U.S. at 593, 113 S.Ct. 2786. ("[M]any factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test.") In other words, it is clear the Court in *Daubert* did not intend for a trial judge to automatically exclude relevant evidence if one of the listed conditions was not fully satisfied.

■ *Daubert* and other cases make clear that, under Rule 702, the trial judge is given discretion in his role as gatekeeper to decide what evidence is relevant, reliable, and helpful to the trier of fact. *See Joiner,* —— U.S. at ——, 118 S.Ct. at 517. This court repeatedly has stated that a district court's inquiry under both Rule 702 and *Daubert* is a flexible one. *See, e.g., Cabrera v. Cordis Corp.,* 134 F.3d 1418, 1420 (9th Cir.1998); *United States v. Cordoba,* 104 F.3d 225, 228 (9th Cir.1997); *Lust v. Merrell Dow Phar-*

*maceuticals, Inc.,* 89 F.3d 594, 597 (9th Cir. 1996). As we stated in *Cordoba:* "District Courts must strike the appropriate balance between admitting reliable, helpful expert testimony and excluding misleading or confusing testimony to achieve the flexible approach outlined in *Daubert.*" 104 F.3d at 228 (quoting *United States v. Rincon,* 28 F.3d 921, 926 (9th Cir.1994)).

Flight presents nothing to this court that would indicate that the district court abused its discretion in this regard. The record supports the district court's finding that Underwood's testimony was reliable, relevant, and helpful to the trier of fact. There is no showing by the defendant that the district court's ruling was manifestly erroneous.[12]

## V. *Exclusion of Portions of the JAG Report*

At trial, Flight attempted to admit into evidence a Judge Advocate General's ("JAG") report written by Lt. Cmdr. William Hamilton, Jr. in July 1992, setting forth findings of fact and opinions regarding the cause of the MU–2 crash. Following a motion from the plaintiffs, the district court ruled that portions of the JAG report were not admissible and Lt. Cmdr. Hamilton was not qualified to render expert testimony.

Flight argues that the district court erred by excluding from evidence "key portions of the JAG investigation report from both the 'Findings of Fact,' and 'Opinions' sections." Flight Br. at 41–42. Flight contends "there is a presumption that the JAG report is trustworthy" and it was the plaintiffs' burden to make a showing of untrustworthiness. *Id.* at 45 (citing *Bradford Trust Co. v. Merrill*

---

**11.** In this regard, we particularly call attention to Justice Blackmun's cogent observation in *Daubert:*

> Respondent expresses apprehension that abandonment of "general acceptance" as the exclusive requirement for admission will result in a "free-for-all" in which befuddled juries are confounded by absurd and irrational pseudoscientific assertions. In this regard respondent seems to us to be overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.... These con-

> ventional devices, rather than wholesale exclusion under an uncompromising "general acceptance" test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702.

509 U.S. at 595–96 (internal citation omitted).

**12.** Flight does not challenge Horton's qualifications or methodology, but instead states his opinions were improper because "Mr. Horton relied on Mr. Underwood's invalid opinion for his conclusions regarding the cause of the accident...." Flight Br. at 39. Because we find that Underwood's opinion was valid and properly admitted, we conclude the admission of Horton's testimony was permissible as well.

*Lynch,* 805 F.2d 49, 54 (2d Cir.1986)). It concludes that "[t]he trial court clearly disregarded the assumption that a report of an official investigation is conducted with competence and objectivity...." *Id.*

Federal Rule of Evidence 803(8)(C) excludes from the hearsay rule all "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... factual findings resulting from an investigation ... *unless* the sources of information or other circumstances indicate lack of trustworthiness." (emphasis added). The Supreme Court specifically has held that Rule 803(8)(C) encompasses evaluative conclusions and opinions taken from a JAG report. *See Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 163–64, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988).

In the *Beech Aircraft* decision, the Supreme Court was quick to point out that one of the main "safeguards" of Rule 803(8)(C) is "the trustworthiness provision [that] requires the [district] court to make a determination as to whether the report, *or any portion thereof,* is sufficiently trustworthy to be admitted." 488 U.S. at 169, 109 S.Ct. 439 (emphasis added). In other words, the district court's "gatekeeper" role is not abrogated simply because the evidence falls under Rule 803(8)(C).

█ Once again, we cannot find that the district court abused its broad discretion by admitting only the portions of the JAG report it deemed to be trustworthy. The full report is an estimated 700 to 800 pages long. The document essentially consists of the oral testimony of Lt. Cmdr. Hamilton, whom Flight did not attempt to qualify as an expert. In fact, as late as the pre-trial conference, Flight itself had disputed the admissibility of the JAG report, *see Desrosiers v. Flight Int'l of Florida, Inc.,* No. 93–5707 (E.D. Calif. April 12, 1996) (pretrial order re: motion in limine) at 6; SER at 6, and initially did not list the report as an exhibit. *See Desrosiers v. Mitsubishi Aircraft Int'l, Inc.,* No. 93–5707 (E.D. Calif. April 4, 1996) (Defendants' exhibit list), at 1–3; SER at 1–3.[13]

When Flight eventually submitted an exhibit list that included the entire JAG report, the district court ordered Flight to identify the specific sections it wished to introduce. *See Desrosiers v. Mitsubishi Aircraft Int'l, Inc.,* Nos. 93–5707, 95–5598 (E.D.Calif. Oct. 23, 1996) (Order re: Plaintiffs' Motion in Limine), ER at 59. Ultimately, the court admitted almost all "Findings of Fact" in the report. *See* SER at 177–84.

Flight is correct that many of Lt. Cmdr. Hamilton's opinions in the JAG report were excluded by the district court. However, the plaintiffs presented sufficient evidence to support the district court's conclusion that Lt. Cmdr. Hamilton was not qualified to render expert opinions. The record shows: 1) Lt. Hamilton did not attend aviation accident reconstruction school until *after* completing the JAG report; 2) he had no formal training in aircraft accident investigation; 3) this was the first JAG aircraft accident report Lt. Hamilton ever prepared; and 4) Lt. Hamilton never reviewed the avionics maintenance records before issuing the report.

Additionally, Flight was not restricted from presenting other witnesses and evidence to address any of the information contained in the JAG report. In this respect, we do not believe Flight was prejudiced in any way by this evidentiary ruling of the district court.

We conclude that the district court reasonably could infer that the proffered opinion evidence of Lt. Hamilton lacked the required trustworthiness for admission under Rule 803(8)(C). Despite Flight's claims to the contrary, there is nothing in the *Beech Aircraft* decision that compels a district court to admit JAG report opinions if those opinions are deemed untrustworthy. *See Johnson v. City of Pleasanton,* 982 F.2d 350, 352 (9th Cir.1992) (stating public records covered by Rule 803(8)(C) can be challenged on grounds of untrustworthiness).

The district court's actions were consistent with its role under *Daubert* and Rule 702 as a "gatekeeper" for relevant and reliable evi-

---

**13.** Flight initially may have sought the exclusion of the JAG report because of the damaging conclusion that "Lt. Garnett's inaccurate position reports" were a "[c]ontributing factor[ ] to the accident." *See* ER at 185.

dence. There is no showing that the district court abused its discretion in performing this function.

## VI. Conclusion

For the reasons discussed, we find that the district court did not abuse its discretion in denying a motion for a new trial, instructing the jury on imminent peril, admitting testimony of the plaintiffs' expert witnesses, or excluding portions of the JAG report. The jury's verdict and the district court's rulings are therefore AFFIRMED.