Filed 12/8/21  Aguirre v. Nissan North Am. CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| JOSE AGUIRRE, | C088270 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. CVPO-14-001385) |
| NISSAN NORTH AMERICA, INC., | |
| Defendant and Appellant. | |

Plaintiff Jose Aguirre was driving into the parking lot of his employer Hines Nursery to start his work day when his 2000 Nissan Xterra suddenly accelerated, collided with the retaining wall of a ramp, and ended up crushed under a trailer.  Aguirre was seriously injured and is nearly quadriplegic.  Defendant Nissan North America, Inc. (Nissan) appeals from a judgment after a bench trial awarding Aguirre $36,197,264 in damages.

The trial court found that the edge of the arm supporting the accelerator pedal became trapped on the edge of the parking brake bracket located immediately to the right,

1

which resulted in the sudden acceleration of the vehicle. Ruling in favor of Aguirre on strict products liability and negligence claims, the trial court concluded that a design defect in the 2000 Nissan Xterra was a substantial factor in causing the crash and Aguirre's injuries.

Nissan does not challenge the trial court's finding that the design of the parking brake assembly in close proximity to the accelerator pedal arm was defective and negligent. Instead, Nissan raises three issues on appeal, two of them focusing on causation.

First, Nissan contends there was no substantial evidence that the accelerator pedal became trapped on the parking brake bracket and caused the sudden acceleration and crash. According to Nissan, at most the evidence raised the possibility that the pedal could have become trapped.

Nissan pays little heed to the substantial evidence standard of review which favors evidence supporting the judgment for Aguirre. (*Doupnik v. General Motors Corp.* (1990) 225 Cal.App.3d 849, 868 (*Doupnik*).) Indeed, Nissan, in its opening brief, omits any mention of this fundamental principle that guides our review. Applying the substantial evidence standard, we conclude that a reasonable inference can be drawn from the evidence presented that the defective and negligent design of the parking brake assembly was a substantial factor in the harm to Aguirre.

Second, Nissan contends that the trial court's comparative fault finding apportioning 100 percent of fault to Nissan was not supported by substantial evidence. Nissan argues that Aguirre testified that he stepped on the brakes when his 2000 Nissan Xterra suddenly accelerated. Nissan contends that Aguirre's own experts testified that the brakes would have stopped or slowed the vehicle. Thus, Nissan maintains that Aguirre did not step on the brakes. However, we are bound by the trial court's determination that Aguirre's testimony that he applied the brakes was credible. Moreover, under the imminent peril doctrine, when his vehicle suddenly accelerated,

2

Aguirre was not required to act with the same level of care as in an ordinary situation. It was for the trial court to determine that Aguirre acted reasonably under the circumstances.

Third, Nissan contends that the trial court erred in excluding the opinion of an expert witness, Rafael Pelayo, that the crash was caused by Aguirre's drowsiness and "micro-sleeps." This opinion was based on general characteristics associated with driver fatigue, such as that Aguirre got too little sleep because he worked two jobs. The trial court excluded this expert testimony as irrelevant and speculative, because there was no evidence that Aguirre was actually drowsy or asleep at the time of the accident. The court did not abuse its discretion. With no evidence that Aguirre was drowsy at the time of the accident, let alone that drowsiness was the cause of the accident, Pelayo's opinion was speculative. Moreover, Pelayo's opinion states matters regarding driver fatigue that are common knowledge and do not require expert testimony. (*Lynn v. Tatitlek Support Services, Inc.* (2017) 8 Cal.App.5th 1096, 1116-1117 (*Lynn*).)

The judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

*Evidence Relating to Causation and Apportionment of Fault*

Aguirre testified at trial. On the day of the accident, August 29, 2012, Aguirre woke up at 5:30 a.m. Aguirre worked two jobs: an eight-hour day shift at Hines Nursery in Winters five to six days a week followed by a shorter night shift at All Weather in Vacaville five days a week. He started at Hines Nursery at 7:00 a.m. and finished at 3:00 p.m. He worked at All Weather from 4:30 p.m. to 8:30 p.m. Sometimes Aguirre worked at All Weather until 11:00 p.m. At trial, he could not remember whether he had worked until 8:00 p.m. or 11:00 p.m. the night before the accident.

On August 29, 2012, Aguirre arrived at Hines Nursery at approximately 6:20 a.m. He entered the unpaved gravel loading station lot at Hines Nursery, which was rutted and slippery with gravel. Aguirre drove across the middle of the lot at 10 to 15 miles per

3

hour, the posted speed limit. There are three ramps from the gravel loading lot leading to a higher level. Trailer trucks were parked to the side of the lot. Aguirre was headed to employee parking at the back of the lot. Aguirre's right leg was leaning to the right against the center console to rest it. He was awake and calm and not in a rush because he had time to get to work.

Aguirre's vehicle started speeding up quickly. He had not moved his foot on the accelerator pedal. He had both hands on the steering wheel. Aguirre took his foot off the accelerator and stepped on the brake. The vehicle kept going. Aguirre was surprised and scared. Aguirre held tightly to the steering wheel, trying to control the vehicle but it went to the left. Aguirre hit a concrete retaining wall on the side of a ramp. He felt his 2000 Nissan Xterra impact a trailer. His foot was still on the brake. The vehicle ended up underneath the trailer. Aguirre testified, "When I hit the ramp, everything happened so quickly. I felt when it hit the trailer. It was milliseconds, I think." Aguirre suffered multiple injuries, including cervical spine injuries, and is nearly quadriplegic.

Aguirre presented testimony from Neil Hannemann, an expert in automotive design and engineering. Hannemann stated that the clearance standard in the automotive industry for accelerator pedals is at least 19 millimeters to allow for variations in installation or manufacturing that might lead to interference with another part beneath the dashboard and cause the throttle to stick. Nissan used a 10-millimeter clearance specification in the 2000 Xterra. Hannemann testified that a clearance of 10 millimeters "is just too small."

Hannemann testified that the minimum width specified for the accelerator pedal arm in the 2000 Nissan Xterra was 14 millimeters. There was no maximum width. The widths of the accelerator pedal arms that Hannemann measured in the subject vehicle and exemplar Xterras ranged from 20.5 to 21.6 millimeters. Since the edge of the widest part of accelerator pedal arm is closest to the edge of the parking brake bracket, wider pedal arms combined with less than 19-millimeter clearance presents a "mechanism" to "catch

4

the pedal." An accelerator pedal "within approximately three millimeters of the bracket" is in the "danger zone . . . that's close enough to where, with some deflection from the way the pedal is applied, can cause the pedal to get stuck."

When Hannemann put four pounds of lateral pressure on the top of the accelerator pedal arm towards the parking brake bracket in an exemplar vehicle, the pedal overlapped the parking brake bracket and stuck. There was space between the right edge of the pedal and the sidewall of the console that a shoe at an angle could exert lateral pressure. Hannemann considered four pounds a light lateral load.

Hannemann testified that in Nissan's cutout of the accelerator pedal arm and the parking brake bracket configuration (which Nissan referred to as a "buck") the clearance was three millimeters.[1] The arm measured 21 millimeters and the clearance between the arm and the parking brake bracket was three millimeters, plus or minus one millimeter. Hannemann testified that this is not enough clearance. A lateral (side-to-side) load on the pedal would catch the parking brake bracket.

Hannemann testified that, beginning in 2002, Nissan no longer used a parking brake bracket in the Xterra located to the right of the accelerator pedal and moved to a foot brake on the other side.[2]

In response to a hypothetical question from Aguirre's counsel based on the circumstances of the accident as testified to by Aguirre—speed of 10 to 15 miles per hour, right leg resting on the sidewall of the center console, sudden acceleration, and

---

[1] In a cutout exemplar created by Aguirre, the clearance between the accelerator pedal top and parking brake bracket was one millimeter.

[2] "The exclusionary rule of [Evid. Code, § 1151, regarding subsequent remedial or precautionary measures] does not apply to an action based on strict liability." 1 Witkin, Cal. Evidence (5th ed. 2019) Circumstantial Evidence, § 172, p. 596; *Ault v. International Harvester Co.* (1974) 13 Cal.3d 113, 118.)

continued acceleration after taking the foot off the accelerator and stepping on the brake—Hannemann testified "[t]hat would be consistent with a stuck accelerator pedal."

Aguirre presented testimony from Eric Rossetter, an accident reconstruction expert. Rossetter testified that various components of the accelerator pedal in a 2000 Nissan Xterra allow side-to-side movement. A foot in a certain position depressing the accelerator pedal can apply side-to-side force. Based on the way the pedal is assembled, when there is a side load, the bottom of the pedal will move to the left and the top to the right. If a person steps on the left of the accelerator pedal, the upper portion of the pedal will move to the right, closer to the parking brake bracket.

Rossetter determined that by pulling the accelerator pedal with five pounds of lateral force leftward it would overlap and be captured under the parking brake bracket on the right. Rossetter testified that five pounds would be consistent with the lateral force someone would apply to an accelerator pedal. When Rossetter did a test with the exemplar of the subject vehicle with three-millimeter clearance between the top of the accelerator pedal arm and the parking brake bracket by pressing the pedal in a lateral fashion, the accelerator pedal would lock up on the parking brake bracket. In the test, to cause interference between the accelerator pedal and the parking brake bracket, the accelerator pedal first had to be depressed longitudinally to 30 percent of its range of travel. The captured accelerator pedal would then continue to accelerate rapidly without any foot pressure to speeds of 30 miles per hour or higher.

In accident reconstruction analysis, Rossetter determined that Aguirre's vehicle was traveling at 30 to 35 miles per hour when it hit the retaining wall of the ramp. The vehicle was 107 to 203 feet from the ramp when the sudden acceleration occurred. From an initial speed of 15 miles per hour, it would have taken the vehicle just over three seconds to travel from where the accelerator pedal was trapped to where it struck the retaining wall. Rossetter testified that the speed of the vehicle was 26 miles per hour when it struck the side of the trailer.

6

Rossetter examined Aguirre's 2000 Nissan Xterra. The accelerator pedal was trapped and remains trapped by the parking brake bracket. Rossetter opined that the pedal was trapped prior to the collision in the position where it is now trapped.

Rossetter opined that "the most likely scenario is that the accelerator pedal was trapped on the bracket, and that's what caused the sudden acceleration and the subsequent collisions." Rossetter testified that his opinion was consistent with his accident reconstruction of speeds of 30 to 35 miles per hour, the distance the vehicle traveled, Aguirre's testimony that he took his foot off the accelerator and the vehicle continued to accelerate, and the final state of the pedal trapped on the parking brake.

Aguirre presented Micky Gilbert as an expert witness in accident reconstruction from the perspective of driver controllability. Gilbert inspected Aguirre's vehicle. He testified that in the thousands of accidents he had looked at he had never seen a throttle pedal stuck down as it was in the subject vehicle, which indicated that it was in this position before it hit the trailer.

Gilbert drove an exemplar of the subject vehicle at the accident site and applied lateral force on the accelerator. When the pedal exceeded 30 percent of its downward range, the pedal was behind the bracket. The speed of the vehicle did not play into the pedal sticking; it was the relative motion of 30 percent that caused the pedal to stick. At 15 miles per hour, the pedal could be down 30 percent. Gilbert did not measure the amount of lateral force but testified that it was not hard to do. The measurement of four to five pounds of lateral force by Hannemann and Rossetter was consistent with Gilbert's perception of the amount of lateral pressure required. Gilbert was able to replicate the pedal sticking on multiple occasions. Even though Gilbert's purpose was to conduct an experiment regarding the stuck pedal phenomenon, he was startled when it occurred despite his five years as a race car driver.

Gilbert testified that laying the right leg against the sidewall of the center console would put the foot in alignment to apply lateral force. Gilbert testified that it was

foreseeable that a driver would apply lateral force to an accelerator pedal. Aguirre's testimony regarding the circumstances of the accident was consistent with a stuck accelerator and unintended acceleration.

Aguirre presented the testimony of John Martin, a lay witness. Martin obtained an exemplar of the subject vehicle where the accelerator pedal caught on the parking brake bracket and created a cutout of the vehicle with the accelerator pedal and parking brake assembly intact. Martin also inspected other exemplar vehicles at various places to determine the conditions under which the accelerator pedal and parking brake bracket would "hook up" in 2000 or 2001 Nissan Xterras or the same model year Frontier vehicles, which had the same configuration, as well as four exemplar vehicles Nissan obtained for the case. Martin also collected five exemplar pedal arms from wrecking yards to determine if any would hook up. He did not limit this search to pedals that would likely hook up.

On the exemplar vehicles, Martin inspected the clearance between the top of accelerator pedal arm (or "yoke") and the parking brake bracket. Then Martin checked the pedal of these exemplars for side-to-side movement with his hand to see if it would hook on the parking brake bracket. Next Martin would determine if he could hook it with his foot. He would not use his foot if the pedal did not hook up with his hand. Martin testified that the force to move the pedal laterally was no more or even less force than it took to push it down. He testified the pedal "moves very easily lateral side to side." The same pressure or less than would be required to drive at a moderate pace was enough to get the pedal stuck.

Of the five pedal arms that Martin collected, the clearance between the pedal arm and the parking brake bracket of one of them was close enough for the pedal to hook up. However, one of the pedal assemblies was from the 2002 Nissan Xterra, where the parking brake was moved to a foot brake on the left side. Martin used normal

longitudinal force and less lateral force. This pedal arm caught the same way using hand or foot.

Martin testified regarding his inspection of vehicle exemplars owned or obtained by Nissan in Salt Lake City, Phoenix, and Houston. The pedal in Salt Lake City did not catch. In Houston, the pedal hooked on the parking brake bracket by Martin exerting longitudinal and then lateral force using his hand. It took one attempt. This was one of the easiest to hook up. There were two exemplar vehicles in Phoenix. Neither vehicle would hook up.

In cross-examination by Aguirre's counsel, defense expert Douglas Young testified regarding the substance of the deposition testimony of Brandon Dawe, produced by Nissan as the person most qualified regarding design specifications of the 2000 model Nissan Xterra. Dawe testified that Nissan anticipated lateral force being applied to the accelerator pedal and conducted testing to attempt to demonstrate driver use of lateral force on the pedal.

Nissan called California Highway Patrol Officer Brian Compton who responded to the accident scene at Hines Nursery on August 29, 2012. Compton observed that Aguirre's Nissan Xterra vehicle had struck a concrete wall and was underneath a tractor trailer. Compton also observed tire marks that went straight back a considerable distance, more than 100 feet, from where the vehicle was located. He further observed that the dashboard and steering wheel area of the vehicle were crushed backward and down.

Nissan read the deposition testimony of Juan Gabriel Perez-Rodriguez at trial. Perez-Rodriguez saw Aguirre crash his vehicle in August of 2012. He was the sole witness to the crash. He was standing by one of the loading docks and heard the noise of the vehicle driving fast, the tires making a lot of noise. Perez-Rodriguez testified Aguirre went straight the whole time. Perez-Rodriguez did not see Aguirre accelerate; he was already speeding. The gravel was marked because of the speed. He did not hear sounds of braking. Perez-Rodriguez did not see rear brake lights. He saw Aguirre's head

9

leaning back against the head rest; he was looking straight ahead. Perez-Rodriguez could not see if Aguirre's eyes were closed. He did not recall telling anyone that Aguirre was asleep.

Nissan presented the testimony of James Walker, an accident reconstruction expert. Walker opined that Aguirre's vehicle hit the retaining wall of the ramp at about 45 miles per hour and traveled 40 feet through the air over the ramp at about the same speed. The vehicle crashed into the trailer at about 25 to 27 miles per hour. Walker presented demonstrative exhibits illustrating his crush analysis opinions. Walker opined that the crash caused crush damage that moved the parking brake assembly leftward towards the driver and rearward, and also moved the parking brake assembly and accelerator relative to each other. Walker testified that "the top of the accelerator pedal presents itself in such a way that the parking brake can capture it as everything is being crushed." Walker concluded that the crush when Aguirre's Xterra struck the trailer trapped the pedal. Walker explained that if the pedal had been stuck without Aguirre's foot on it, the pedal would have been dislodged when the vehicle struck the ramp. He concluded that the pedal could only have been trapped by the parking brake if Aguirre's foot was holding the pedal forward of the parking brake at or near full throttle.

Nissan presented testimony from Michael James, an expert witness in automotive design and performance. James testified that it was impossible to wedge a work boot of the same size and manufacturer that Aguirre was wearing at the time of the accident on the inside edge of the accelerator pedal between the center console wall to exert lateral force on the pedal.

*The Trial Court's Findings of Fact Relating to Causation and Apportionment of Fault*

The parties waived jury trial and the court conducted a bench trial on Aguirre's products liability claims based on strict liability and negligence.

On August 22, 2018, the trial court issued a statement of decision. The statement of decision included findings of fact related to causation and foreseeability, as follows:

10

*Causation*

"According to testimony by Plaintiff's experts, the pedal arm itself was susceptible to movement towards the parking brake bracket when laterally loaded. As a consequence of the close proximity between the inboard edge of the upper pedal arm and the outboard edge of the parking brake bracket, foreseeable lateral loading of the pedal could not only cause contact between the pedal arm and brake bracket, but could also result in entrapment of the upper part of the pedal arm on the brake bracket. The Court observed such effect, either contact or entrapment, in Plaintiff's exemplar vehicle, in two of Nissan's exemplar vehicles, in various photographs of other exemplar vehicles, and in the demonstrative 'cut-out' exemplars produced by Plaintiff and by Defendant. Further, it is undisputed that post-crash, the accelerator pedal was entrapped on the brake bracket on the subject vehicle driven by Plaintiff. Plaintiff's experts presented compelling evidence that when such entrapment occurred, the 2000 model Xterra would accelerate suddenly, or fail to decelerate, even though the driver's foot was not on or otherwise activating the accelerator pedal. Nissan's argument that the accelerator pedal in Plaintiff's Xterra became entrapped on the parking brake bracket only as result of the impact from the crash, and not before the crash (and therefore, was not the cause of the crash) was not persuasive.

"The evidence demonstrated that foreseeable lateral loading of the pedal arm occurred during Plaintiff's operation of Plaintiff's 2000 Nissan Xterra and that as a result, the inboard edge of the top of the pedal arm . . . was entrapped on the outboard edge of the parking brake bracket. This caused the Plaintiff's Xterra to suddenly accelerate, which in turn resulted in the subject collision."

"Nissan also altered the design from a pull-out handle to a foot-activated parking brake. Although Nissan denied that these modifications were intended to eliminate any potential for pedal interference, the evidence is undisputed that relocating the parking brake bracket completely eliminated any such potential."

11

"[T]he design defect was a substantial factor in causing the subject Nissan 2000 Xterra to accelerate suddenly."

"According to Nissan's technical specifications, the width of the pedal arm was expected to be no less than 14mm wide. There was no upper specification limiting the width. By design, the clearance between the inboard side of the upper arm of the pedal arm was supposed to be less than 10mm from the outboard side of the parking brake bracket. [¶] The only evidence presented at trial as to what constitutes appropriate space between these components was that industry standards require a minimum of 19mm of clearance."

Had Nissan engineers inspected pedal arms of Xterra vehicles post-production, they "would have determined that the top of the pedal arm itself . . . as manufactured was significantly wider than the 14mm specified in Nissan's technical drawings, which further reduced the already close clearance tolerance between the pedal arm and brake bracket."

"Although these particular components were only in close proximity to one another for two model years in the Xterra models, Plaintiff Jose Aguirre suffered catastrophic injuries because of the defect."

"For all the reasons stated above, the design defect in the subject 2000 Nissan Xterra, whether due to strict product liability or negligence or both, was a substantial factor in causing harm to Plaintiff."

*Apportionment of Fault*

"Plaintiff was driving a route he knew well, in a car he knew well, on his regular commute to work. There is no evidence to suggest that he misapplied the accelerator pedal. Were there no other evidence as to the cause of this crash, the misapplication theory might have more credence. However, the weight of all the evidence, and in particular the crash reconstructions, demonstrates it is far more likely than not that it was

12

the accelerator pedal-parking brake bracket conflict that caused the crash and Plaintiff's injuries, not that Plaintiff forgot how to use the pedals in his car."

"[T]he Court, sitting as the trier of fact, found that the sudden acceleration event was caused by a design defect not of Plaintiff's making. Under the circumstances of this case, Plaintiff acted as a reasonably careful person would have acted after his vehicle suddenly accelerated. Mr. Aguirre testified that he tried to slow or stop the vehicle by putting his foot on the brakes, and tried to control the vehicle's path. The fact that he was unable to avoid the collision does not establish that his conduct was negligent, especially since the emergency was not caused by Plaintiff."

Based on the evidence, the court assigned 100 percent of the responsibility to Nissan for the harm to Aguirre. The court awarded $36,197,264 in total damages to Aguirre.

## DISCUSSION

### *Causation*

The substantial evidence standard applies to findings by the trier of fact on issues of causation. (*Doupnik, supra*, 225 Cal.App.3d at p. 868; *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1315-1316 (*Pannu*); *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 678.)

In *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570 (*Schmidt*), the appellate court recently summarized the substantial evidence standard of review: "We review the trial court's factfinding for substantial evidence. This traditional standard of review is highly deferential. It has three pillars. First, we accept all evidence supporting the trial court's order. Second, we completely disregard contrary evidence. Third, we draw all reasonable inferences to affirm the trial court. These three pillars support the lintel: We do not reweigh the evidence. [Citation.] Under this standard of review, parties challenging a trial court's factfinding bear an ' "enormous burden." ' [Citation.]" (*Id.* at pp. 581-582.)

"If substantial evidence supports factual findings, those findings must not be disturbed on appeal. [Citation.] Inferences favorable to appellants may create conflicts in the evidence, but that is of no consequence. [Citation.] When a civil appeal challenges findings of fact, the appellate court's power begins and ends with a determination of whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court findings. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. [Citation.]" (*Schmidt, supra*, 44 Cal.App.5th at p. 582.)

"Our job is only to see if substantial evidence exists to support the verdict in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events. [Citation.]" (*Schmidt, supra*, 44 Cal.App.5th at p. 582; see also *Perez v. VAS S.p.A.* (2010) 188 Cal.App.4th 658, 683-684.)

In *Doupnik*, we applied this standard in a products liability case involving a vehicle crash where, as here, the defendant manufacturer contended on appeal that a finding that a product defect caused the crash and injury was not supported by substantial evidence. "A judgment must be upheld if there is substantial evidence in its support. The core of the rule—the doctrine of conflicting inferences—is applicable here. 'In so far as the evidence is subject to opposing inferences, it must upon a review thereof be regarded in the light most favorable to the support of the judgment.' [Citation.] The question of conflicting inferences arises with respect to a *material* fact in the case, i.e., a fact critical to the judgment. If conflicting inferences may be drawn regarding a material fact the appellate court is required to draw the inference favorable to the judgment. 'Even if this court were of the opinion that that determination was wrong, it would not have the power to substitute its deductions for those of the trial court. For, as has so often been said, when opposing inferences may reasonably be drawn from the facts in a case, the findings

14

of the trial court will not be set aside.' [Citations.]" (*Doupnik, supra*, 225 Cal.App.3d at p. 868; see also *Romine v. Johnson Controls, Inc.* (2014) 224 Cal.App.4th 990, 1000.)[3]

"The testimony of a single witness may be substantial evidence, including the testimony of an expert. However, 'when an expert based his or her conclusion on factors that are "speculative, remote or conjectural," or on "assumptions . . . not supported by the record," the expert's opinion "cannot rise to the dignity of substantial evidence" . . . . [Citations.]' [Citations.]" (*Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 314.)

In pursuing products liability claims, Aguirre had the burden of proof that Nissan's conduct was the legal cause of his injury. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*); *Doupnik, supra*, 225 Cal.App.3d at pp. 867-868.) To carry that burden, Aguirre had to produce evidence that placement of the accelerator pedal in close proximity to the parking brake bracket was a substantial factor in bringing about the injury he suffered. (*Soule, supra*, at p. 572; *Doupnik, supra*, at p. 868.) Aguirre did not have to prove with complete certainty that the defect caused his injury, only that it was a substantial factor in bringing about the harm suffered. (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 121-122 (*Campbell*); see also *Doupnik, supra*, at pp. 868-869.)

" 'The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.' [Citation.]" (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79.) "Thus, 'a force which plays only an "infinitesimal" or "theoretical" part in bringing about injury, damage, or

---

[3] "An appellant, on the other hand, must demonstrate that there is *no* substantial evidence to support the challenged findings." (*Bates v. John Deere Co.* (1983) 148 Cal.App.3d 40, 49 (*Bates*); *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 64.) "It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact." (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)

loss is not a substantial factor' [citation], but a very minor force that does cause harm is a substantial factor." (*Ibid.*; see also *Demara v. The Raymond Corp.* (2017) 13 Cal.App.5th 545, 554-555 (*Demara*); CACI No. 403.)

Preliminarily, we address a confusion of the issues on the part of the appellant. Nissan frames the causation issue on appeal as "[w]hether the judgment should be reversed because there is no substantial evidence to support Aguirre's allegation that the accelerator pedal in his vehicle became entrapped in the parking brake bracket and, in turn, caused unintended acceleration leading to his crash." Yet, as mentioned, Nissan omits any discussion in its opening brief of the substantial factor test that we apply in reviewing the question of causation.

Instead, Nissan combines the "reasonably foreseeable use" element of a strict products liability claim with the substantial factor element to argue "there is no substantial evidence that the crash was caused by foreseeable use of Aguirre's vehicle."[4] We note that Aguirre alleged strict products liability claims against Nissan under the consumer expectations test and the risk-benefit test, and the trial court made findings of fact on both tests.[5] The reasonably foreseeable use element is stated in the pattern

---

[4] Nissan cites *Pannu* which in turn cites *Soule*. (*Pannu, supra*, 191 Cal.App.4th at p. 1310 ["A manufacturer may be held strictly liable for placing a defective product on the market if the plaintiff's injury results from a reasonably foreseeable use of the product"]; *Soule, supra*, 8 Cal.4th at p. 560 ["A manufacturer, distributor, or retailer is liable in tort if a defect in the manufacture or design of its product causes injury while the product is being used in a reasonably foreseeable way"].) We read these statements not to define the causation element of a design defect products liability claim but as a general outline of the claim itself. Moreover, *Soule* endorsed the substantial factor inquiry as the test of causation. (*Soule, supra*, at p. 573 ["The general causation instruction given by the trial court correctly advised that plaintiff could not recover for a design defect unless it was a 'substantial factor' in producing plaintiff's 'enhanced' injuries"].)

[5] "[A] product may be found defective in design, so as to subject a manufacturer to strict liability for resulting injuries, under either of two alternative tests. First, a product may be found defective in design if the plaintiff establishes that the product failed to perform

16

instruction, CACI No. 1203, for a strict liability claim based on a design defect under the consumer expectation test.  (CACI No. 1203 ["That the [*product*] did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way"].)  CACI No. 1203 states the causation element separately.  (CACI No. 1203 ["That the [*product*]'s failure to perform safely was a substantial factor in causing [*name of plaintiff*]'s harm"].)[6]

The pattern jury instruction regarding the risk-benefit test, CACI No. 1204, includes a substantial factor element but not a reasonably foreseeable use element.  In *Barker*, the California Supreme Court endorsed jury instructions for both the consumer expectation and the risk-benefit test.  The court referenced reasonably foreseeable use in the consumer expectation test but not the risk-benefit test.  "We hold that a trial judge may properly instruct the jury that a product is defective in design (1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if the plaintiff proves that the product's design proximately caused his injury and the defendant fails to

_____

as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.  Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design."  (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 432 (*Barker*); see also *Demara, supra*, 13 Cal.App.5th at pp. 553-554 [plaintiff may prove design defect strict liability claim alternatively under the consumer expectations and risk-benefit tests or both may be presented to the trier of fact].)

[6] Nissan argues the trial court's finding on causation was that "foreseeable lateral loading of the pedal could not only cause contact between the pedal arm and brake bracket, but also could result in the entrapment of the upper part of the pedal arm on the brake bracket."  This finding is contained in the court's findings of fact that the design of the 2000 Nissan Xterra was defective under the consumer expectation test.  The trial court also held Nissan liable under the risk-benefit test without any reference to reasonably foreseeable use.

17

prove, in light of the relevant factors discussed above, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Barker, supra*, 20 Cal.3d at p. 435.)

However, reasonably foreseeable use has been recognized as an element of claim under the risk-benefit test. (*Perez, supra*, 188 Cal.App.4th at p. 678; Sources and Authority foll. CACI No. 1204; see also *Soule, supra*, 8 Cal.4th at p. 561.)

Under either test, causation measured by the substantial factor test is a separate element of a design defect claim. (*Demara, supra*, 13 Cal.App.5th at p. 554 ["Under both the consumer expectation test and the risk-benefit test, in proving a cause of action for design defect, the plaintiff must establish that the product's failure to perform safely was a substantial factor in causing the harm to the plaintiff"]; CACI Nos. 1203, 1204.)[7] In holding Nissan liable under both strict liability design defect tests, the trial made a separate finding under both tests that "the design defect was a substantial factor in causing the subject Nissan 2000 Xterra to accelerate suddenly."

Taking Nissan at its word that its challenge on appeal is whether substantial evidence supports the trial court's finding that a design defect—i.e., the close proximity of the accelerator pedal to the parking brake bracket—caused Aguirre's vehicle to suddenly accelerate and crash, we conclude that the court's finding that the design defect was a substantial factor in bringing about harm to Aguirre is supported by substantial evidence.

---

[7] The trial court noted in the statement of decision that "the Court and the parties have acknowledged" that "Plaintiff only had to prevail on one theory of liability" and "the Court has reached a determination" that Nissan is liable "as to all three causes of product liability . . . ." In making this determination, the court stated it applied the law stated in CACI instructions, which were attached to the statement of decision, including CACI No. 1203 (consumer expectation test) and CACI No. 1204 (risk-benefit test).

Nissan argues that the evidence is deficient because the testimony of Aguirre and his expert witnesses "*at most* demonstrated the pedal entrapment was *possible* by applying some amount of lateral force to the accelerator pedal arm under controlled conditions." We disagree. "The expert opinions given on the mechanism of causation were sufficient to establish the cause." (*Doupnik, supra*, 225 Cal.App.3d at p. 869; cf. *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1119-1121 [expert witness failed to provide reasoned explanation how retractor left in the peritoneal cavity caused an infection in subcutaneous tissue by "opining '[i]t just sort of makes sense' "].)

In essence, Aguirre's evidence was that the industry standard for accelerator pedal arm clearance is 19 millimeters to preclude contact between the pedal and another part underneath the dashboard that might cause the pedal to stick. Nissan, however, used a 10-millimeter clearance for the accelerator pedal in a 2000 Nissan Xterra, which put the pedal in close proximity to the parking brake bracket. Nissan also specified a minimum width of 14 millimeters for the accelerator pedal arm but no maximum width. Actual pedal arms in exemplar vehicles measured between 20.5 and 21.6 millimeters. Wider pedal arms and clearance less than 10 millimeters created a "mechanism" for the pedal to "catch" on the parking brake. The clearance between the pedal arm and parking brake bracket in a cutout of the pedal and parking brake bracket measured just three millimeters, which Aguirre's expert testified was within "danger zone" where "some deflection from the way the pedal is applied . . . can cause the pedal to get stuck."

A light lateral load of four to five pounds on the accelerator was sufficient to cause an accelerator pedal arm in exemplars of 2000 Nissan Xterra vehicles and Aguirre's cutout of the accelerator pedal-parking brake configuration to overlap the parking brake and stick. There was space between the accelerator pedal and console sidewall for a driver's foot to be applied to accelerator pedal at an angle, creating lateral pressure and causing the accelerator pedal arm to be trapped on the parking brake bracket. A

19

nondefective vehicle would not continue to accelerate after a driver took his foot off the pedal, as Aguirre testified occurred in his 2000 Nissan Xterra.

We conclude that this evidence was sufficient to support a reasonable inference that when, as Aguirre testified, his 2000 Nissan Xterra suddenly accelerated and kept accelerating when he took his foot off the pedal, the cause was the accelerating pedal arm catching on a parking brake bracket because of insufficient clearance between them.

In addition, the accelerator pedal of Aguirre's vehicle was found trapped on the edge of the parking brake bracket after the crash. Rossetter, Aguirre's accident reconstruction expert, testified to his opinion that, based on the circumstances of the accident described by Aguirre in his testimony, the pedal was trapped before the crash. "It is ordinarily within the competence of an expert in the field of automobile accidents to predicate an opinion about the cause of an injury upon the descriptive characteristics of an accident and to express it in that form." (*Doupnik, supra*, 225 Cal.App.3d at p. 869.)

Nissan counters that "Rossetter himself admitted that the pedal 'is actually trapped in this position from crush damage.' " Rossetter made the comment Nissan quotes merely to confirm for the trial court that a photo exhibit was of Aguirre's vehicle. The court said, "I'm assuming that's the subject vehicle," and Rossetter responded, "Correct. And I will just point out that one other clear indication that we're looking at the subject vehicle is that the throttle pedal is actually trapped in this position from crush damage, and there is actually a penny that is wedged between the bottom of the pedal and the floor that's stuck there."

Further, as Nissan acknowledges, Rossetter stated his disagreement with Nissan's position that the pedal was trapped during the crash. "I believe, in the Aguirre vehicle, the accelerator pedal was trapped on the parking brake bracket, where it is entrapped today in its current state. And I disagree that that entrapment came from just solely the crush damage, which is one of the arguments that the Defense has. And I evaluated their crush analysis, and I do not believe it's accurate." When asked the basis of his opinion

20

the accelerator pedal top was trapped in the parking brake bracket before the crash, Rossetter stated, "from all of my work, all of the inspections and the testing, I know that entrapment can occur on these Nissan Xterra vehicles. [¶] This entrapment allows the vehicle to accelerate from 15 miles an hour without an input from a driver. In fact, you will get well over speeds of 15 miles an hour with it in that position. Therefore, it's consistent with my reconstruction speeds of 30 to 35. It's consistent with the motion we have, the distances that the vehicle traveled, and, of course, the final state, which is an accelerator pedal trapped on top of the parking brake bracket."

This is not a case in which Aguirre's experts' opinions rested on sheer speculation and guesswork. (See *Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 487-488.) Aguirre's experts based their opinions on analysis of the accident, inspection of the subject vehicle, and testing of exemplar vehicles and cutouts of the pedal arm and parking brake bracket configuration.

As noted in the statement of decision, the trial court also had the advantage of observing the top of the pedal arm trapped on the brake bracket in "Plaintiff's exemplar vehicle, in two of Nissan's exemplar vehicles, in various photographs of other exemplar vehicles, and in the demonstrative 'cut-out' exemplars produced by Plaintiff and by Defendant." The judge was able to visualize for herself that the close proximity between the top of the pedal arm and the parking brake bracket could result in entrapment. (*Doupnik, supra*, 225 Cal.App.3d at p. 869 [jurors viewing photographs and the subject vehicle could visualize how defective roof welds injured plaintiff's neck].)

We have included in the factual background a summary of the testimony of Nissan's experts, Walker and James, respectively, that the pedal arm became trapped by the brake bracket when the crash pushed the bracket toward the driver and it was impossible for Aguirre to fit his work boot between the pedal and sidewall of the center console to exert lateral pressure. However, as an appellate court, we do not undertake to resolve the dispute between Aguirre's and Nissan's experts. That is the province of the

21

trial court. (*Doupnik, supra*, 225 Cal.App.3d at pp. 868-871.) The trial court found that "Nissan's argument that the accelerator pedal in Plaintiff's Xterra became entrapped on the parking brake bracket only as a result of the impact from the crash . . . was not persuasive."

In any event, Nissan points to no evidence that compels a contrary conclusion as a matter of law, i.e., that compels the sole inference that the accelerator pedal arm catching on the parking brake bracket was not the cause of Aguirre's injuries. Rather, we conclude the trial court reasonably inferred the accelerator pedal more likely than not became trapped by the parking brake bracket and caused the crash from evidence that (1) the accelerator pedal arm and parking brake bracket in the 2000 Nissan Xterra were in close proximity (as little as three millimeters), (2) light lateral pressure could cause the pedal arm to become trapped on the parking brake bracket, (3) the pedal arm in Aguirre's vehicle was found trapped on the bracket, and (4) Aguirre testified that the vehicle continued to accelerate after he took his foot off the pedal. The inferences drawn from this evidence is substantial evidence supporting the trial court's finding that a design defect in Aguirre's 2000 Nissan Xterra was a substantial factor in the crash and his injuries. (*Doupnik, supra*, 225 Cal.App.3d at pp. 869-870.)

To the extent that Nissan seeks to incorporate "reasonably foreseeable use" into the causation inquiry, we find substantial evidence supporting the trial court's finding that "foreseeable lateral loading" of the pedal arm in Aguirre's 2000 Nissan Xterra resulted in the pedal arm being trapped on the parking brake bracket. Nissan argues that none of Aguirre's experts "measured the amount of lateral force typically applied under normal driving conditions." By this, Nissan means the experts measured the amount of force when moving the pedal laterally with their hands to cause it to stick but did not measure the amount of force when causing the pedal to stick with their feet. Nissan further maintains that entrapment by Aguirre's experts only occurred by "operating the

22

pedal in a highly unusual way," i.e., by pressing down on the pedal first longitudinally and then applying lateral force.

We do not find it significant that Aguirre's experts did not measure the precise amount of lateral pressure in testing exemplar vehicles to demonstrate that foot pressure could cause the pedal arm to stick on the parking brake bracket. Causation need not be shown with mathematical proof. (See *Doupnik, supra*, 225 Cal.App.3d at pp. 868-869; *Campbell, supra*, 32 Cal.3d at p. 120.) We see no reason that "reasonably foreseeable use" would require precise measurement. Furthermore, as the trial court found, Dawe, Nissan's person most qualified regarding design specification, "testified that lateral loading of the pedal during ordinary operation of the vehicle is foreseeable."

Nissan asserts that "the *only* evidence in the record regarding the amount of lateral force normally applied while driving was offered in the 'pedal force study' " conducted by its expert Young that "revealed" four to six pounds of lateral force "would be highly unusual and an unforeseeable use of the Xterra," because a sample set of 12 drivers and more than a million statistical simulations "did not record a single instance of lateral forces greater than 3.8 pounds." Nissan points to Young's testimony that, based on this data, "the likelihood of somebody producing a force outside of three pounds is very, very low."

Nissan omits that the trial court commented that "[s]tatistics don't prove conduct" and "the problem is statistics are very helpful in predicting tendencies of populations" but "unless you've got some authority that tells me I can use it to predict what an individual does on a particular day in a particular circumstance, I don't believe we can get there." Thereafter, the court sustained Aguirre's counsel's objections to Young's opinions on (1) whether a driver would apply five pounds of lateral force to depress an accelerator to accelerate to 15 miles per hour, (2) whether a driver would apply a lateral load in excess of three pounds, and (3) the likelihood that a driver would apply 3.8 pounds of lateral pressure "is very, very low." In the statement of decision, the trial court noted it

23

"sustained numerous objections to Dr. Young's opinion testimony on the grounds that it called for speculation and lacked foundation." In effect, Nissan on appeal seeks to rely on expert opinion excluded by the trial court. However, Nissan does not challenge the court's ruling excluding Young's opinion. "As a result, any issues concerning the correctness of the trial court's evidentiary rulings have been waived. [Citations.] We therefore consider all such evidence to have been properly excluded. [Citation.]" (*Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1014-1015.) Our inquiry is confined to whether there is any substantial evidence, i.e., *admissible* evidence of ponderable legal value, that supports the judgment. (See *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 612.)

As for application of longitudinal followed by lateral pressure on the accelerator pedal at which point the pedal stuck, Nissan's attempt to establish that there was no substantial evidence that it was foreseeable a driver would operate the accelerator pedal down and to the side is belied by Dawe's testimony that Nissan anticipated lateral force being applied and attempted to test for it. Nissan's argument amounts to a bare assertion that "[t]here is no reason to think that Aguirre—or any reasonable driver—would operate the accelerator pedal in this manner" without the support of evidence compelling that conclusion. To the contrary, Martin testified that after application longitudinal force, the lateral pressure is "a very light force. Once you have the pedal down, you just slightly move your foot sideways. And if it's going to hook, it hooks on." Given Dawe's testimony and the testimony of Aguirre's experts, we conclude substantial evidence supports the trial court's finding that lateral pressure on the accelerator pedal was reasonably foreseeable use.

Aguirre's and Nissan experts testified extensively, thoroughly explaining the parties' respective positions regarding causation. The court accepted Aguirre's experts over Nissan's. We have found no reason to displace the trial court's determinations, nor is it our province to do so. Our review of the record discloses substantial evidence

24

allowing the court to find that a design defect in Aguirre's 2000 Nissan Xterra caused the crash and his injuries.

*Apportionment of Fault*

We also review the apportionment of fault for substantial evidence under the same principles. (*Bates, supra*, 148 Cal.App.3d at p. 52 ["As with other questions of fact, the appellate court may not substitute its judgment for that of the trier of fact concerning apportionment of fault under comparative negligence rules if there is any evidence which under any reasonable view supports the apportionment"]; see also *Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1234; *Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 203.) "The party attacking the apportionment must cite all the material evidence which supports the determination and bears the burden of demonstrating that there is no substantial evidence to support it. [Citation.]" (*Bates, supra*, at p. 52.)

Nissan argues that the trial court's determination that Aguirre was not at fault because he testified he stepped on the brake and tried to control the vehicle is not supported by substantial evidence, given that Aguirre's own experts testified that applying the brakes would have slowed or stopped the vehicle. According to Nissan, "[t]he only conclusion available from the evidence presented at trial is that Aguirre did nothing, as the eyewitness (Perez-Rodriguez) described: 'no brake lights' were seen as [Aguirre] 'went straight' into the concrete ramp and the parked tractor-trailer."

In relying on Aguirre's testimony that he stepped on the brake and tried to control the path of the vehicle, the trial court necessarily determined that Aguirre's testimony was credible. The court as the trier of fact "is the sole judge of the credibility of the witnesses . . . ." (*Pescosolido v. Smith* (1983) 142 Cal.App.3d 964, 970; *Schmidt, supra*, 44 Cal.App.5th at p. 582.) "The fact finder's determination of the veracity of a witness is final. [Citation.] Credibility determinations thus are subject to extremely deferential review. [Citation.]" (*Schmidt, supra*, at p. 582; *Cuiellette v. City of Los Angeles* (2011)

194 Cal.App.4th 757, 765 [" 'We may not reweigh the evidence and are bound by the trial court's credibility determinations' "].) The trier of fact is also "the sole arbiter of all conflicts in the evidence . . . ." (*Pescosolido, supra*, at p. 970; *Davis v. Kahn* (1970) 7 Cal.App.3d 868, 874.) Thus, we do not second guess the trial court's acceptance of Aguirre's testimony that he stepped on the brake and tried to control the vehicle.

The trial court also relied on the doctrine of imminent peril or sudden emergency in finding that Aguirre was not negligent and therefore not responsible for the accident. Under the doctrine, "a person who, without negligence on his part, is suddenly and unexpectedly confronted with peril, arising from either the actual presence, or the appearance of, imminent danger to himself or to others, is not expected nor required to use the same judgment and prudence that is required of him in the exercise of ordinary care in calmer and more deliberate moments. [Citations.]" (*Leo v. Dunham* (1953) 41 Cal.2d 712, 714 (*Leo*); see CACI No. 452; *Damele v. Mack Trucks, Inc.* (1990) 219 Cal.App.3d 29, 36 (*Damele*); *Shiver v. Laramee* (2018) 24 Cal.App.5th 395, 399.) The duty of care required to be exercised is only what an ordinarily prudent person would exercise in the same situation. (*Damele, supra*, at p. 36.) "A person in impending peril, where immediate action is necessary to avoid it, is not required to exercise all that presence of mind which is normally exacted of a careful and prudent person under ordinary circumstances, nor to show that his inability to escape from the threatened danger was a physical impossibility." (*Sills v. Los Angeles Transit Lines* (1953) 40 Cal.2d 630, 636 (*Sills*).) However, where the party seeking to invoke the doctrine contributed to the perilous situation, the doctrine does not apply. (*Philo v. Lancia* (1967) 256 Cal.App.2d 475, 482.)

Whether a person was suddenly confronted with imminent peril is a question of fact for the trier of fact to determine. (See *Leo, supra*, 41 Cal.2d at p. 715; *Damele, supra*, 219 Cal.App.3d at p. 37.) Likewise, whether the party invoking the doctrine was free of negligence is also a question of fact for the exclusive determination of the trier of

26

fact.  (See *Stickel v. Durfee* (1948) 88 Cal.App.2d 402, 405-406.)  The requirement that the party invoking the doctrine be free from negligence is satisfied by substantial evidence.  (*Grinstead v. Krushkhov* (1964) 228 Cal.App.2d 793, 796.)  Conflicting testimony regarding the reasonableness of the conduct of the party invoking the doctrine is for the trier of fact to determine.  (*Sills, supra*, 40 Cal.2d at p. 636.)

Fundamentally, "no one suddenly confronted with an unexpected peril is to be held responsible for omitting precautions which hindsight might indicate would have avoided the accident.  He is required to do only what a reasonable and prudent person would do in a like situation.  'In every such emergency it is a question for the trier of fact to determine whether the person acted with reasonable care under all the circumstances.' [Citation.]"  (*Reynolds v. Filomeo* (1951) 38 Cal.2d 5, 14.)

Applying these principles, the trial court's finding that Aguirre did not cause the emergency and acted reasonably after the vehicle suddenly accelerated must be upheld as supported by substantial evidence, to wit, Aguirre's credible testimony that he stepped on the brake and tried to control the vehicle's path, notwithstanding any conflicting evidence cited by Nissan.

### Exclusion of Expert Testimony

Nissan contends the trial court erred in excluding the testimony of its "sleep" expert, Pelayo, that "based on the available evidence—including Aguirre's limited time to sleep, demanding schedule working two shifts for two different employers doing manual labor, poor sleep due to a back injury and sleeping in the same room as young children, and other factors—Aguirre was likely drowsy and experiencing microsleeps while driving on the morning of the collision."  Relying in part on this testimony, "Nissan intended to prove that Aguirre's collision was caused by drowsiness, not anything to do with the design of the Xterra."

Aguirre filed a motion in limine to exclude Pelayo's testimony as speculative and lacking foundation and scientific basis.  The trial court did not grant the motion but

27

deferred ruling to an Evidence Code section 402 hearing conducted before Pelayo testified.

At the hearing, in response to argument from Nissan's counsel regarding the significance of criteria established by the National Transportation Safety Board (NTSB) regarding drowsy driving, the trial court observed, "I understand this is your rich field of scientific inquiry, and has been for sometime [*sic*] as it relates to driving, as it relates to work, and I don't mean to demean or limit what Dr. Pelayo might say, but none of it is relevant. It is speculative, fascinating, but speculative unless we have something that says this guy was drowsy."

After further argument, the court said, "Here is what I am going to do. I think it is a fair statement to say that I am somewhat over expansive in what I allow, because as I've said, I would rather have a little too much than too little. . . . [B]ut I don't see even the basic level of factual basis that would justify Dr. Pelayo testifying. So if you want to bring him in to make your record as an offer of proof, you're welcome to do that." However, the court advised that "I don't have any information that this driver was drowsy at the particular time he was driving. Could he have been drowsy at some point in his life because he's a shift worker, well, sure, but that's speculation. That's not something that would be more likely than not. [¶] I'm going to sustain the objection to Dr. Pelayo as his testimony not being relevant based on the factual record I have at this point in the trial. Should that change, then maybe we'll reconsider that, but at this point, that's where we are."

Nissan's counsel queried, "is the court making a finding that the sleep schedule of Mr. Aguirre isn't sufficient basis for a sleep doctor to make a determination of whether he would experience drowsiness on the day of the crash?"

The trial court responded: "Let me parse that out for you because it is an important point. [¶] Dr. Pelayo can certainly say that based on his body of records and his own research, that someone who is a shift worker may experience sleep deprivation

28

and drowsiness. I'm sure he can describe that in much greater detail than I can, but that doesn't mean that on a particular moment that driver was drowsy and that caused the accident. Because that information, even accepted as true, won't move the needle on more likely than not on the preponderance. It doesn't have enough evidentiary weight for me to apply. [¶] Is that true as a general statement of the populus [*sic*]? I'm sure it is. Is it helpful to me as a trier of fact to decide whether this particular driver experienced that at that particular moment? No. There simply isn't enough factual evidence to hang that opinion on. So, therefore, given the state of the evidence now, his opinion would be speculative and not probative, which makes it [inadmissible under Evidence Code section] 352."

When Pelayo was called as witness, counsel for Nissan made an offer of proof that Pelayo would testify that he used a method established by the NTSB to determine if fatigue or drowsiness caused an accident. That method called for, first, examination of the physiological factors that indicate a person has inadequate sleep, including the amount and quality of sleep, and, second, if such factors are present then the circumstances of the accident are evaluated to determine if they are consistent with inadequate sleep. If both parts of the inquiry are present, in the absence of alternative explanations such as intoxication, then fatigue and drowsiness are "considered the cause of the accident."

Counsel proffered that Pelayo would testify that the physiological factors are present in evidence that Aguirre: works two shifts at two jobs; gets up early to drive his wife to work and drop his children with a relative; sleeps with young children in the same room; reported restless sleep from a back injury from May to August of 2012; takes a nap on weekdays and sleeps in four hours on weekends; kept water by the bed indicating mouth breathing; and snored at times. Pelayo would testify as to performance effects that: Aguirre drove off course and deviated from his path; the accident occurred at a peak time for drowsy accidents in his age group; Aguirre was driving alone; the accident was

29

very serious; the absence of drugs or alcohol; absence of reaction to avoid impact consistent with a lack of "situational awareness"; no attempt to change course by steering; no evidence of braking and brake lights; and Aguirre was observed leaning back in the seat before the impact.

Pelayo, present in the courtroom, confirmed for the trial court that the proffer would be the substance of his testimony.

" 'Evidence Code section 801, subdivision (b), states that a court must determine whether the matter that the expert relies on is of a type that an expert reasonably can rely on "in forming an opinion *upon the subject to which his testimony relates*." (Italics added.) We construe this to mean that the matter relied on must provide a reasonable basis for the particular opinion offered, and that an expert opinion based on speculation or conjecture is inadmissible.' [Citation.]" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770 (*Sargon*).) "Thus, under Evidence Code section 801, the trial court acts as a gatekeeper to exclude speculative or irrelevant expert opinion." (*Id.* at p. 773.) " 'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.' [Citation.]" (*Id.* at p. 771.)

"A trial court exercises discretion when ruling on the admissibility of expert testimony under Evidence Code section 801, subdivision (b). If [as here] the court excludes expert testimony on the ground that there is no reasonable basis for the opinion, we review the exclusion of evidence under the abuse of discretion standard. [Citations.]" (*Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.]" (*Sargon, supra*, 55 Cal.4th at p. 773.) A trial court's decision to admit or exclude expert opinion " 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' [Citation.]" (*Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283 (*Kotla*); *People v.*

*McDowell* (2012) 54 Cal.4th 395, 426 [" 'When expert opinion is offered, much must be left to the trial court's discretion' "].)

We conclude the trial court properly exercised its discretion to exclude speculative expert testimony based on general characteristics associated with drowsy driving accidents. (See *David v. Hernandez* (2017) 13 Cal.App.5th 692, 699 (*David*) [expert's opinion properly excluded as speculative that driver was under the influence of marijuana based on physical symptoms associated with marijuana use, the negative effect of marijuana on driving performance, and that the driver was in an accident].) Pelayo opined that Aguirre was drowsy or asleep using an NTSB methodology that involving identifying characteristics of a drowsy driver accident. The physical characteristics identified in Nissan's proffer—e.g., working two shifts at two jobs, sleeping with children in the bedroom—were present every day of Aguirre's working life. But there was no evidence that Aguirre had ever been found sleeping on the job at Hines Nursery. Aguirre testified that he was awake and calm on the day of the accident. The sole witness to the accident, Perez-Rodriguez, denied ever stating that Aguirre appeared to be asleep. Moreover, that Aguirre worked two shifts and got up early is not a basis for an expert opinion on causation where there was no evidence of the amount of sleep Aguirre got the night before the accident. (See *Lynn, supra*, 8 Cal.App.5th at p. 1116 [without knowing how much driver slept the night before the accident, expert's opinion that driver was fatigued and fatigue caused the accident lacked basis and "was nothing more than pure speculation"].)

The characteristics of the accident on which Pelayo based his opinion—e.g., evidence that the vehicle went straight into the ramp—appears to be reasoning backward. (See *David, supra*, 13 Cal.App.5th at p. 698.) In other words, Aguirre's vehicle would not have done so unless he was asleep; therefore he was asleep.

In addition, "[e]xpert opinion should be excluded ' "when 'the subject of the inquiry is one of such common knowledge that men of ordinary education could reach a

31

conclusion as intelligently as the witness.' " ' [Citations.]" (*Kotla, supra*, 115 Cal.App.4th at p. 291; *ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277, 295.) In *Lynn*, an expert offered an opinion, inter alia, that " 'long work hours at a stressful job leads to reduced sleep in both time and quality and; with the absence of an adequate recovery period, fatigue results' "; " 'driving while fatigued is dangerous' "; " 'fatigued drivers have slowed reaction times and fall asleep at the wheel' "; and " 'fatigued drivers are less precise in their driving and fail to remain in their lane of travel.' " (*Lynn, supra*, 8 Cal.App.5th at p. 1116.) The court referred to this opinion as a "generic, commonly known view among the general public . . . ." (*Ibid.*) The court held that the expert's opinions were not only speculative but also "rest on common knowledge rather than on matters of a type reasonable relied upon in forming medical opinion." (*Id.* at pp. 1116-1117.)

Other courts have excluded the opinions of a proposed expert on fatigue for the same reason. For example, the court granted a motion in limine to exclude the opinions of an expert witness, e.g., that a tractor-trailer driver was fatigued at the time of the accident because he worked too many hours and had too little sleep. (*Ryans v. Koch Foods, LLC* (E.D.Tenn. July 16, 2015, No. 1:13-cv-234-SKL) 2015 U.S.Dist. Lexis 179979 [2015 WL 11108937, *6].) In *Ryans*, the court said "determining whether a certain work schedule led to fatigue is a matter of common knowledge and does not require any scientific, technical, or other specialized knowledge." (*Ibid.*; see also *Vance v. Midwest Coast Transport, Inc.* (D.Kan. Jan. 5, 2004, No. 01-1422-WEB) 2004 U.S.Dist. Lexis 31168 [2004 WL 3486464, *4] [granting motion in limine to exclude expert opinion that driver's work schedule led to fatigue that caused him to improperly park his truck because "[a]ssuming for the purposes of this motion that a work/rest schedule is the best measure of driver's fatigue . . . [t]he effect of irregular sleep and prolonged driving are well known"]; *Bridges v. Enterprise Products Co.* (S.D.Miss. Feb. 8, 2007, No. 3:05cv786-WHB-LRA) 2007 U.S.Dist. Lexis 9224 [2007 WL 465738,

*4] [whether driver "was fatigued and whether that fatigue proximately caused the subject collision are not required to assist the jury in understanding the evidence or the facts in this case," because "the effects of driving extended periods of time are generally known by the 'average man' "]; *McCollum v. UPS Ground Freight, Inc.* (D.Ariz. Aug. 30, 2012, No. CV11-0961-PHX-DGC) 2012 U.S.Dist. Lexis 123418 [2012 WL 3758837, *2] ["Because [driver] fatigue based on lack of sleep is not an issue 'beyond the common knowledge of the average layperson,' the Court cannot conclude that expert testimony is required"].)

Finally, we reject Nissan's contention that "[e]xcluding Pelayo's testimony that the collision was caused by Aguirre's drowsiness, instead of anything to do with the Xterra, left Nissan unable to tell its side of the 'story,' and thus stripped it of its 'day in court.' " As stated in Nissan's proffer, all the evidence that Pelayo would rely on to opine that driver drowsiness caused the accident was presented to the trial court, including that Aguirre worked two shifts at two jobs. The only thing excluded was Pelayo's speculative opinion on causation. Based on the evidence, the trial court as a trier of fact was fully capable of determining based on the evidence presented whether Aguirre's drowsiness rather than a design defect caused the collision.

We conclude the trial court did not abuse its discretion in excluding Pelayo's opinion that Aguirre was drowsy and drowsiness caused the accident.

## DISPOSITION

The judgment is affirmed. Aguirre shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　RAYE, P. J.


33

We concur:


_____/s/_____
BLEASE, J.


_____/s/_____
MAURO, J.